1  Charles P. Maher, State Bar No. 124748
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
3  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
4
   Attorneys for Appellee
5  Andrea A. Wirum, Successor-in-Interest to
   Charles E. Sims, as Chapter 7 Trustee
6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11 | In Re RAMIN YEGANEH,          | Case No. 4:08-cv-01816 CW

12 |            Debtor,

13 | _____

14 | RAMIN YEGANEH,

15 |            Appellant,          | **APPELLEE'S BRIEF**

16 | v.

17 | ANDREA A. WIRUM, TRUSTEE,

18 |            Appellee.

19 | _____

20        Appellee Andrea A. Wirum, Chapter 7 Trustee in Bankruptcy (the "Trustee"), hereby submits

21 her appellee's brief.

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

**Page**

I.    BASIS OF APPELLATE JURISDICTION ......................................................... 1

II.   ISSUE PRESENTED ON APPEAL ................................................................ 1

III.  STANDARD OF REVIEW .......................................................................... 1

IV.   SUMMARY OF THE TRUSTEE'S OPENING BRIEF ................................... 1

V.    STATEMENT OF FACTS ........................................................................... 3

VI.   ARGUMENT ............................................................................................ 6

      A.    Probability of Success ........................................................... 6
      B.    Complexity, Expense, and Delay ........................................... 11
      C.    Paramount Interest of Creditors ............................................ 11

VII.  CONCLUSION ........................................................................................ 11

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re A&C Properties*, 784 F. 2d 1377, 1380 (9th Cir. 1986) ........................................................ 1

*In re A&C Properties*, 784 F. 2d 1377, 1381 (9th Cir. 1986) ..................................................... 1, 6

*Segura v. McBride*, 5 Cal. App. 4th 1028, 1038 7 Cal. Rprt. 436 (First Dist. 1992) .................... 9

*Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*,
    504 F.3d 775 (9th Cir. 2007) ................................................................................................ 1

STATUTES

28 U.S.C. § 158 ............................................................................................................................. 1

Cal. Bus. & Prof. Code § 17200 ............................................................................................... 4, 7

Cal. Civ. Code § 1695 ............................................................................................................... 4, 7

Cal. Civ. Code § 1695.3(a) ....................................................................................................... 6, 8

Cal. Civ. Code § 1695.3(h) .......................................................................................................... 8

Cal. Civ. Code § 1695.6 ............................................................................................................... 8

Cal. Civ. Code § 1695.6(b)(3) ................................................................................................... 10

Cal. Civ. Code § 1695.7 ............................................................................................................. 10

Cal. Civ. Code § 1695.13 ........................................................................................................... 10

Cal. Civ. Code § 1695.14(d) ...................................................................................................... 10

Cal. Civ. Code § 2945.1 ........................................................................................................... 4, 7

Federal Rule of Bankruptcy Procedure 8001 ............................................................................... 1

ii

1    **I.    BASIS OF APPELLATE JURISDICTION**

2        This Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 158 and

3    Federal Rule of Bankruptcy Procedure 8001.

4    **II.    ISSUE PRESENTED ON APPEAL**

5        The issue on appeal is whether the Bankruptcy Court abused its discretion when it authorized

6    the Trustee to compromise the amount and priority of the claim of Robert and Alyssa Scott in the

7    above case over the objection of the Debtor.  In approving the compromise, the Bankruptcy Court

8    considered the evidence presented by the Trustee and the Debtor and found that the Trustee had

9    demonstrated that the compromise was fair and equitable under the standards set forth in *In re A&C*

10   *Properties*, 784 F. 2d 1377, 1381 (9th Cir. 1986).

11   **III.    STANDARD OF REVIEW**

12       The Bankruptcy Court's findings of fact are reviewed for clear error, and the Bankruptcy

13   Court's conclusions of law are reviewed *de novo.  E.g., Sigma Micro Corp. v. Healthcentral.com (In*

14   *re Healthcentral.com),* 504 F. 3d 775, 783 (9th Cir. 2007).  The Bankruptcy Court's order approving

15   the Trustee's application to compromise a controversy is reviewed for an abuse of discretion.  *In re*

16   *A&C Properties*, 784 F. 2d 1377, 1380 (9th Cir. 1986).

17   **IV.    SUMMARY OF THE TRUSTEE'S OPENING BRIEF**

18       Robert and Alyssa Scott filed a general unsecured claim in the amount of $500,000.  The claim

19   was timely filed.  The Scotts' claim was based on the alleged violation by the Appellant (Debtor

20   Ramin Yeganeh, the "Debtor") of California's Home Equity Sales Contract Act and other

21   unconscionable conduct when the Debtor purchased from the Scotts the equity in their residence when

22   it was under threat of foreclosure.

23       The Debtor contended from the outset that the Scotts' claim had no legal or factual basis and

24   provided the Trustee with information and documents to support his position.  The Trustee concluded

25   that the Scotts' claim was overstated and had certain other deficiencies but was likely valid in a

26   smaller dollar amount.  The Trustee's informal attempts to negotiate a reduction in the amount of the

27   claim were unsuccessful.  Similarly unsuccessful were the Trustee's attempts to negotiate with the

28   Debtor a reasonable claim amount which the Debtor could accept and which, in the long run, would

1

result in avoidance of attorney fee expense.

The Trustee objected to the Scotts' claim. The proof of claim itself was a single piece of paper; under applicable law, the proof of claim did not have "*prima facie* validity" because the writing on which it was based was not attached. When the Trustee objected to the Scotts' claim on this and other grounds, the Scotts presented documentary evidence in support of their claim. The Debtor's argument in the Bankruptcy Court and on appeal that the claim still does not have *prima facie* validity is incorrect and was made moot by the Scotts' filing of documents in support of the claim. The Trustee filed pleadings in response to the evidence the Scotts provided in support of their claim, engaged in some discovery, and ultimately agreed to a January 2, 2008, trial date. Immediately before trial, a settlement was reached; the agreement was read into the record in the Bankruptcy Court on January 2, 2008, and was subject to subsequent order of the Bankruptcy Court on notice to creditors and the Debtor. The result of the compromise was a $275,000 reduction in the amount of the Scotts' claim and a division of the remaining claim into two components with different priorities for payment: (a) a $100,000 unsecured claim entitled to *pro rata* payment with all other unsecured claims and (b) a lower priority $125,000 claim that will receive payment only after all general unsecured claims are paid in full.

Considering the risks inherent in litigating the claim dispute and the associated cost, the Trustee considered the compromise to be fair and reasonable and in the best interest of the estate. At a trial, the Trustee would have to deal with certain damaging facts that no rational person could dispute. Other facts were disputed and at trial the Trustee would be forced to rely in part on testimony of the Debtor whose credibility has been subject to serous question. The Trustee considered it likely that the Debtor had violated certain aspects of California's Home Equity Sales Contract Act and that an adverse ruling on the objection was likely; the Trustee considered the real question to be the extent of damages caused by the Debtor and the amount of the Scotts' allowed claim against the bankruptcy estate.

The Trustee served on creditors a notice describing the compromise of the claim explaining her rationale for entering the compromise. No creditor objected. The Debtor did object and, in support of his objection, filed his own declaration and the declaration of his attorney. A hearing was

APPELLEE'S BRIEF

1   held on the objection.  The Bankruptcy Court clearly enunciated its findings of fact on the record,

2   overruled the Debtor's objection, and approved the compromise.

3       In the Debtor's opening brief, the Debtor fails to demonstrate any error by the Bankruptcy

4   Court.  He merely argues that his version of disputed facts is correct and reaches questionable

5   conclusions based on that version of the facts.  The Debtor does not demonstrate that the Bankruptcy

6   Court made clear error in its findings of fact or abused its discretion in approving the compromise

7   proposed by the Trustee.  The Bankruptcy Court order should be affirmed.

8       For the convenience of the Court, the Trustee has prepared and is filing with this opening brief

9   an excerpt of record which contains excerpts of documents in the designated record.  The references

10  designated in this brief are to the excerpt of record and are identified as "ER" with corresponding page

11  numbers.  Cross-references to the designated record on appeal by Bankruptcy Court docket numbers

12  are contained in the table of contents to the excerpt of record.

13  **V.    <u>STATEMENT OF FACTS</u>**

14      The Debtor entered into an equity purchase agreement with Robert and Alyssa Scott to

15  purchase the equity in the Property.  [ER050 – 051].  The agreement is dated November 18, 2002.

16  [ER050].  By grant deed executed on December 6, 2002, and recorded in the Official Records of

17  Alameda County on December 6, 2002, the Scotts conveyed title to "R. Rad, a single man." [ER053].

18  After receiving title from the Scotts, the Debtor, using the "R. Rad" alias, conveyed title to an entity

19  called "Allied Management Trust." [ER089: 25 - 90:2].

20      The Debtor paid approximately $164,000 for the Property.  [ER006: 14], and the Trustee has

21  inferred that the Debtor continues to believe that what he paid represented the fair market value at the

22  time.  The Scotts claimed that the value of the Property was $240,000 or more at the time of sale.

23  [ER088: 27-28.]  Based on the conclusion of her appraiser, the Trustee believed that the value of the

24  Property at the time of sale was approximately $190,000.  [ER088: 28 – 089: 1].  The Trustee

25  anticipated that the Court would consider conflicting testimony on the value of the Property and could

26  reach a valuation in the low $200,000 range.  [ER089: 1-2].

27      Robert and Alyssa Scott filed a $500,000 general unsecured claim in this case based on

28  "fraudulent foreclosure rescue." [ER009].  The Scotts had previously filed a complaint against the

<center>3</center>

1  Debtor in Alameda County Superior Court. [ER084: 28 – 085: 2].  In the complaint, the Scotts

2  alleged claims against the Debtor for violations of the California Home Equity Sales Contract Act

3  (Cal. Civ. Code §§ 1695 *et seq*., "HESA"), Foreclosure Consultants Law (Cal. Civ. Code §§ 2945.1 *et*

4  *seq*.), Unfair Business Practices Act (Cal. Bus. & Prof. Code §§ 17200 *et seq*.), fraud, and undue

5  influence arising out of the Debtor's prepetition purchase from the Scotts of their primary residence

6  (the "Property"). [ER020: 7-10]. [ER085: 3-7].

7      The Trustee filed an objection to the Scotts' claim in January 2007. [ER085: 7-8].  The Scotts

8  filed an extensive opposition to the objection. [ER019: 19-21].  The Scotts disputed the primary facts

9  that supported the Trustee's objection to their claim.  [ER086: 10-19, ER088: 26 – 089: 25].  The

10  Trustee filed an extensive response to the Scotts' opposition in September 2007 based on documents

11  provided to the Trustee by the Debtor.  [ER015 – 035, ER088: 3-7].  Trial was scheduled for January

12  2, 2008.  [ER085: 9-10].  The Trustee conducted written discovery [ER085: 11-12], retained an

13  appraiser and discussed with her the value of the Property [ER085: 14-16], and prepared for trial.  The

14  Trustee estimated that trial would take three or four days and cost the estate a considerable sum in

15  attorneys fees.  [ER090: 13-19].

16      Serious settlement discussions took place between the Trustee and the Scotts shortly before the

17  scheduled January 2, 2008, trial date.  An agreement was reached before the trial and counsel for the

18  Trustee and the Scotts appeared in the Bankruptcy Court on the trial date and read the settlement terms

19  into the record.  [ER085: 20-21].  Under the requirements of the Bankruptcy Code, separate Court

20  approval of the compromise on notice to creditors was a condition to Court approval.  On January 15,

21  2008, the Trustee served notice of the compromise.  [ER037-039].  No creditor objected, but the

22  Debtor did object.  A hearing on the objection was held on February 29, 2008.  [ER091].

23      The Bankruptcy Court agreed with the Trustee's assessment of the probability of success on

24  the merits, the expense of trial, and the best interests of the creditors and stated its findings on the

25  record at the hearing:

26          I'm going to approve the proposed compromise. I want to go through the *A &*
          *C Properties* factors.

27
          The first factor and the most important is whether this settlement is within the
28          range of reasonableness with respect to the taking account of the amount at issue and

4

the merits of the action. And I think that there are three things which make this settlement within the range of reasonableness.

Number one, this statute is very unforgiving. It's a very robust statue that gives the very strong power to rescind a sale and to recover damages where the procedural requirements of the Home Equity Sales Act are not fully complied with.

Number two, whether the Act is going to apply here, whether there's been a violation of the Act, is going to turn into a credibility contest between the applicants and the debtor.

And the debtor's record of dealing with property and inconsistent statements is like — that is a grown-up that has been demonstrated in these other adversary proceedings and which are likely admissible to show intent and lack of mistake are going to substantially handicap the debtor in such a credibility contest.

The third is to go to trial would cost the estate substantial attorneys' fees. And if the estate loses they will pay not only their own fees for that trial but the Scotts' fees for that trial because of the fee-shifting statute. These are very, very substantial risks.

I agree with the Trustee that it's — from what I can see of this, that the Scotts' claim is overstated in amount. It looks, however, like it — there's a substantial possibility that they would prevail to some damages and that the — that there would — that damages would not be insignificant, the attorneys fees would be recoverable and be significant.

A second *A & C* factor is the difficulty of collection. I think both parties have correctly noted that that is not a factor in this case and does not — not compel a settlement that would otherwise not be warranted.

The third factor is cost and delay involved in trying the claim. I don't think delay is so much of a problem, unless there was an appeal. But the cost is for the reasons I've mentioned. It is a factual matter: it's a heavily-factual matter. There's enough at stake that the trial would require considerable discovery and two or three days of trial likely. And, again, there is a very distinct possibility the estate would bear the cost of both sides.

And last is the wishes of creditors and other parties-in-interest. Now I don't think the Trustee has convinced me that the debtor, because of the fraudulent conveyances, has no possible interest in the proceeds. The case, Judge Weissbrodt's decision that you decided, talks about in *pari delicto*, but then also talks about *Moore versus Bay*, which brings it all back into the estate. It's very ambiguous as to whether it would have the effect of that the Trustee argues.

The one thing that is clear, however, is that the creditors are — clearly have an interest in this. And the debtor may have an interest in it. And none of the creditors have objected.

And I think, looking at the pool of potential beneficiaries realistically, the creditors are the more important, and they have not objected to this.

So under that analysis of the *A & C Properties*, the Trustee's judgment should be sustained and the settlement approved. The Trustee should be accorded authority to enter into this settlement.

<center>5</center>

1    ER100-102.

2    **VI.    ARGUMENT**

3    In evaluating a proposed compromise in a bankruptcy case, a court must determine whether the

4    compromise is fair and reasonable.    The Ninth Circuit has established a test for making this

5    determination.    The bankruptcy court must consider the following four factors:

6    1.    The probability of success in the litigation;

7    2.    The difficulty, if any, to be encountered in collection;

8    3.    The complexity of the litigation involved and the expense, inconvenience, and delay

9    necessarily attending it; and

10    4.    The paramount interest of creditors and proper deference to their reasonable views.

11    *In re A&C Properties*, 784 F. 2d 1377, 1381 (9th Cir. 1986).

12    The primary factors for consideration of the compromise with the Scotts were the first and

13    third:  (a) the probability of success and (b) complexity, expense, and delay.

14    A.    Probability of Success

15    In the notice the Trustee served on creditors, the Trustee made the following statement:

16    > The Trustee believes that the probability of success is uncertain.  The
17    > Trustee believes the Scotts will be unable to prove certain elements of their
    > claim.  The Trustee believes that the most serious question for the Court to
    > consider is the element of damages the Scotts may have suffered.  Based on
18    > appraisals of the property in question, the Trustee believes there is a strong
    > likelihood that, if the Court found that the Debtor had violated the law, the
19    > Scotts would be able to demonstrate some damages, although not in the
    > amount they sought in their proof of claim.  The negotiated reduction brings
20    > certainty to the amount of damages and the amount and category of the
    > Scotts' claim.

21

22    ER038.

23    The Debtor correctly points out in his opening brief that the Trustee's initial position on the

24    Scotts' claim was a strong challenge to its validity.  [ER:011-013].  The position was based on

25    information provided primarily by the Debtor, including documents [ER088: 3-7], the credibility of

26    the Debtor [ER087: 19-22], and a belief that the dates of documents were accurate.  The Trustee's

27    initial position required the Trustee to discount two problems:  (a) that the Debtor had paid fair market

28    value for the Property or close to fair market value [ER030: 2-4]; and (b) that the Debtor's use of an

6

1  alias when he purchased the Property did not violate Section 1695(3)(a) of the California Civil Code.

2  [ER029: 1-2].  Other problems with the Debtor's story came to light, creating further factual disputes

3  and increasing doubts about the probability of success.  [ER088: 9-15].  At all times, the Trustee was

4  concerned about the Debtor's credibility as a witness [ER087: 15-22], particularly because the Debtor

5  would have to be the Trustee's primary witness in support of the objection.

6      In considering the probability of success in litigation over the validity of the Scotts' claim, the

7  Trustee reviewed the legal arguments the Scotts had presented in favor of their claim as well as the

8  arguments the Trustee had articulated in a pleading filed in the Bankruptcy Court on September 10,

9  2007, in furtherance of her objection to the Scotts' claim; the Debtor incorporated this pleading in his

10  opposition to the compromise and included it in the record on appeal [ER015-035].

11      Before she proposed the compromise, the Trustee took the position in her objection to their

12  claim that the Scotts had presented insufficient evidence to support claims against the Debtor under

13  the California Foreclosure Consultant Law or the Unfair Competition Law.    The Trustee

14  acknowledged that whether her position on these two specific claims would be accepted by the Court

15  at trial was an open question.  The Trustee acknowledged that the Foreclosure Consultant Law (Cal.

16  Civ. Code §§ 2945.1 *et seq*.) might be broad enough to cover the acts of the Debtor and the Debtor

17  would be found to have violated that law. The Trustee was confident in her position that the Scotts

18  would be unable to demonstrate that the Debtor had violated California's Unfair Competition Law

19  (Bus. & Prof. Code §§ 17200 et seq.).

20      The Scotts also alleged that the Debtor was liable to them for common law fraud.  The

21  documents the Scotts filed in response to the Trustee's objection did not state with sufficient

22  specificity the facts giving rise to the alleged fraud.  However, the Trustee acknowledged that it was

23  possible that, at trial, the Scotts might be able to prove with sufficient evidence that the Debtor had

24  defrauded them and that their pleadings would be amended to conform with proof.

25      The Trustee was most concerned about the primary theory of liability asserted by the Scotts:

26  alleged violation of the Home Equity Sales Contract Act (Section 1695 *et seq*. of the California Civil

27  Code).  The Home Equity Sales Contract Act ("HESA") imposes restrictions on persons seeking to

28  purchase equity in homes that are in foreclosure and imposes penalties for violations of those

7

1    restrictions.

2         The Scotts alleged numerous violations of HESA. Included among them were two the Trustee

3    challenged: (a) the Debtor required that the Scotts execute and deliver the grant deed before the

4    statutory cancellation period had elapsed (Civil Code §1695.6); and (b) the Debtor recorded the grant

5    deed before the statutory cancellation period had elapsed (Civil Code §1695.6). [ER027-029]. The

6    Trustee's original position in September 2007 that these two allegations were false was based on

7    information provided by the Debtor in which he asserted that (a) the Equity Purchase Agreement had

8    been executed on November 18, 2002, (b) the statutory cancellation period expired on November 25,

9    2002, and (c) the grant deed had been executed on December 6, 2002. The Scotts have directly

10   contradicted these "facts," and have asserted in declaration and elsewhere that the Equity Purchase

11   Agreement was not executed on November 18, 2002, but at a later date, and was back-dated by the

12   Debtor. In a declaration filed by another creditor, Nicole Wilkins, Ms. Wilkins has corroborated the

13   Scotts' assertions, stating that the Equity Purchase Agreement was executed by the Scotts in her

14   presence on December 6, 2002, the day on which the grant deed was executed and recorded. [ER088:

15   8-10]. If the Scotts and Ms. Wilkins are telling the truth, the Debtor violated three important HESA

16   provisions. At the very least, there was a serious factual dispute and uncertainty over whose

17   testimony the Court would believe.

18        In her objection to the Scotts' claim, the Trustee also characterized as false the Scotts'

19   allegation that no written notice had been given to the Scotts informing them of their right to refrain

20   from signing any instruments of conveyance until the statutory cancellation period had elapsed (Civil

21   Code §1695.3(h)). The declaration of the Scotts and the declaration of Ms. Wilkins call into question

22   the veracity of the Debtor's story on this point. A factual dispute exists about whether there was

23   proper notice to the Scotts of their right to refrain from signing conveyance documents before the

24   cancellation period expired.

25        There is no question that the Debtor did not provide the Scotts with the "name, business

26   address, and telephone number of the purchaser" as required by Section 1695(3)(a) of the Civil Code.

27   He used a false name "R. Rad" when he signed the agreement.

28

APPELLEE'S BRIEF

There are serious questions about the Debtor's veracity and credibility that only the Debtor can ignore.   The Bankruptcy Court made a comment about the Debtor's lack of credibility that underscored the Trustee's deep concerns about using him as her primary witness at trial:

> [T]he debtor's record of dealing with property and inconsistent statements … that has been demonstrated in these other adversary proceedings and which are likely admissible to show intent and lack of mistake are going to substantially handicap the debtor in such a credibility contest.

ER100: 022-101:2.

On the question of liability, therefore, several damaging facts could not be disputed in good faith and serious disputes existed about others.  The Trustee had to recognize the risk that the Court would disbelieve the Debtor's testimony in favor of the Scotts.  As the Bankruptcy Court noted, whether HESA was violated would be determined by a credibility contest between the Debtor and the Scotts  [ER100: 19-21].

Recognizing the risk of an adverse ruling on liability, the Trustee had to reckon with the question of damages.  Under HESA, compensatory damages comprise lost equity at the date of the alleged violation and lost appreciation.  The Debtor claimed that he had paid fair market value.  The Scotts claimed that the Property was worth at least 50 percent more than the Debtor paid.  The Trustee retained an appraiser to evaluate the Property and testify as her expert witness.   The appraiser attributed a value of $190,000 to the Property at the sale date resulting in damages for lost equity of $26,000.  As explained below, that sum could be trebled.

A finding of liability and resulting damages could also result in an award of attorney fees.  The Scotts hired their own appraiser who attributed a slightly higher value.  The Trustee concluded that there was a significant risk the Bankruptcy Court would have found the $26,000 difference between fair market value and what the Debtor actually paid to be a violation of HESA.

The Scotts claimed damages for lost appreciation in the years since the sale closed.  Under HESA, a seller seeking damages for lost appreciation must include proof that it would have had a colorable chance of holding on to the property to realize the appreciation. *Segura v. McBride*, 5 Cal. App. 4th 1028, 1038 7 Cal. Rprt. 436 (First Dist. 1992).  The Trustee believed it was unlikely the Scotts would be able to demonstrate that they could have held on to the Property to realize the

9

1    appreciation, but acknowledged risk the Scotts could sustain their burden.

2        Treble damages was also a concern to the Trustee.  Section 1695.7 of the Civil Code provides

3    treble damages for (a) transactions found to be unconscionable (Civil Code §1695.13) and (b)

4    transactions followed by subsequent transfer or encumbrance of the property (Civil Code

5    §1695.6(b)(3)).  The Trustee believed there was a substantial risk that treble damages would be

6    available under either alternative.

7        Civil Code Section 1695.13 prohibits transactions if "by the terms of such transaction [the

8    equity purchaser] takes unconscionable advantage of the property owner in foreclosure" (Cal. Civ.

9    Code §1695.13).  If the Bankruptcy Court determined that (a) the Equity Purchase Agreement was

10   executed on December 6, 2002, and back-dated to November 18, 2002, and (b) the Debtor rushed the

11   Scotts through execution of the agreement and grant deed, the Bankruptcy Court might have

12   concluded that the totality of the circumstances demonstrated an unconscionable advantage in favor of

13   the Debtor under Civil Code Section 1695.13, and awarded treble damages to the Scotts under Civil

14   Code Section 1695.7.  Although less probable in the Trustee's opinion, the Bankruptcy Court could

15   also have determined that the price paid by the Debtor was unconscionably low.

16       Treble damages are also available to an equity seller when the equity purchaser transfers the

17   property to someone else after the initial purchase.  Cal. Civ. Code §1695.6(b)(3).  Several months

18   after the equity sale to "R. Rad" closed, "R. Rad" transferred the Property to Allied Management

19   Trust.  The subsequent transfer to Allied Management Trust violated Section 1695.6(b)(3).  The

20   Trustee has argued that her subsequent recovery of the Property as a fraudulent conveyance from

21   Allied nullified the subsequent transfer.  However, it is not certain that the Court would agree.  If not,

22   treble damages would be available under Section 1695.6(b)(3).

23       Finally, Civil Code Section 1695.14(d) provides for an award of reasonable attorney fees and

24   costs to the prevailing party in an action for rescission under HESA.  If the Scotts prevailed in any

25   aspect of their claim, an award of attorney fees would be possible.  The Scotts claimed that their

26   attorneys fees exceeded $100,000.

27       Based on all of the facts available to the Trustee, including exchanges in discovery, the Trustee

28   concluded that there was a high probability that the Scotts would be entitled to a claim in some

10

APPELLEE'S BRIEF

amount. She concluded that part of the Scotts' claim would be a substantial attorney fee award which would be a general unsecured claim in the case. The Bankruptcy Court agreed with this assessment. [ER101: 8-13].

By eliminating $275,000 of the Scotts' original claim and providing that $125,000 of the remaining amount would be subordinated to general unsecured claims, the Trustee mitigated the estate's exposure and avoided a potentially much larger general unsecured claim against the estate.

### B.     Complexity, Expense, and Delay

If the compromise had not been approved, the Trustee would have proceeded to trial on the claim objection. The negotiations between the Trustee and the Scotts began relatively late in the litigation process. Accordingly, discovery was complete and counsel had begun to prepare for trial. If a trial were put back on the Court's calendar, counsel would have to prepare again for trial. Based on the number of witnesses the Scotts anticipated calling at trial, the Trustee anticipates that the trial would take three or four days to complete. The required attorney time would be significant as would the attorney fees associated with it. The Bankruptcy Court agreed with this assessment. [ER101: 18-25]. The Trustee did not and does not predict extensive delay in administration of the bankruptcy estate if a trial were to be held.

### C.     Paramount Interest of Creditors

No creditor objected to the compromise. The Trustee believes it was reasonable to infer that the creditors supported the compromise as the Bankruptcy Court noted. This factor militated in favor of the compromise. [ER102: 10-16].

## VII.     <u>CONCLUSION</u>

The Bankruptcy Court's findings of fact are supported by the record presented to it in support of the compromise proposed by the Trustee. The Debtor/Appellant has not demonstrated any error on the part of the Bankruptcy Court in its findings of fact. Furthermore, the Debtor/Appellant has not demonstrated that the Bankruptcy Court abused its discretion in

//

//

//

11

approving the proposed compromise after consideration of the facts and legal basis presented by the Trustee and the Debtor's objection to the compromise. The Bankruptcy Court order ought to be affirmed.

DATED: July 18, 2008                    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: /s/Charles P. Maher, Esq., CSBN 124748
     CHARLES P. MAHER
     Attorneys for Appellee Andrea A. Wirum,
     Successor-in-Interest to Charles E. Sims

301042440.1

12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

| | |
|---|---|
| In re RAMIN YEGANEH, | Case No. 4:08-cv-01816 CW |
| Debtor. | |
| RAMIN YEGANEH, | Bankruptcy Case No. 05-30047 TEC |
| Appellant, | |
| v. | |
| ANDREA A. WIRUM, TRUSTEE, | |
| Appellee. | |

**APPELLEE'S EXCERPT OF RECORD**

Charles P. Maher, CSB 124748
LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone:  (415) 356-4600
Facsimile:   (415) 356-4610

Attorneys for Appellee Andrea A. Wirum,
Successor-in-Interest to Charles E. Sims

# TABLE OF CONTENTS

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Declaration of Debtor Re Debtor's Objection to Trustee's Notice of Compromise of Claim of Robert & Alyssa Scott | 388 | 1 | ER-001 |
| Declaration of Andrea A. Wirum | 393 | 2 | ER-081 |
| Declaration of Jeffrey L. Fillerup in Support of Compromise | 393 | 3 | ER-084 |
| Transcript of February 29, 2008 hearing before United States Bankruptcy Court, Northern District of California, San Francisco Division regarding compromise with Robert and Alyssa Scott | 415 | 4 | ER-091 |
| Order Authorizing Compromise | 405 | 5 | ER-106 |

# Document No. 1

1 | WILLIAM E. GILG
Attorney at Law, SBN 151991
2 | 305 San Bruno Avenue West
San Bruno, CA 94066
3 | 650-871-8647
650- 873-3168 (fax)
4
Attorney Specially Appearing for Debtor,
5 | Ramin Yeganeh

**FILED**

FEB 0 4 2008

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

6

7

8

9                     UNITED STATES BANKRUPTCY COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11

12 | In re RAMIN YEGANEH,        ) Case No. 05-30047 TEC
                                 )
13 |          Debtor.              )
                                 )
14 |                                  ) DECLARATION OF DEBTOR RE
                                 ) DEBTOR'S OBJECTION TO
15 |                                  ) TRUSTEE'S NOTICE OF
                                 ) COMPROMISE OF CLAIM OF
16 |                                  )  ROBERT & ALYSSA SCOTT
                                 )
17 |                                  )
                                 ) Date: February 29, 2008
18 |                                  ) Time: 9:30 AM
                                 ) Judge: Thomas E. Carlson
19 |                                  )

20

21 | I, RAMIN YEGANEH, declare as follows:

22 | 1. I am the debtor in the above-entitled bankruptcy proceeding.

23

24 | 2. The Scotts filed a proof of claim for $500,000 on April 28, 2005. No documentation

25 | was attached to the proof of claim form. The stated basis for the Scotts' claim was

26 | "fraudulent foreclosure rescue claim". A true and correct copy of this proof of claim is

27 | attached hereto as Exhibit #1.

28

Debtor's Objection to Compromise          -17-

3. The Scotts' claim is based on a writing called the "Equity Purchase Agreement", which was not attached. Thus the Scotts' proof of claim does not have prima facie validity.

4. The Scotts' claim relates to the sale of their property located at 1278 79th Avenue, Oakland, California on December 6, 2002. The Scotts alleged that the sales contract they entered into with me on November 18, 2002 did not comply with the Home Equity Sales Contracts Act ("HESA") contained in Civil Code sections 1695, et seq, and that I violated HESA. The Scotts alleged that I acted as a foreclosure consultant and that I intentionally and negligently made factual misrepresentations regarding said sale.

5. The Scotts filed a First-Amended Complaint against me and five other defendants in the Alameda County Superior Court. I filed a cross-complaint against the Scotts alleging fraud, breach of contract, etc.

6. I filed for a Chapter 13 Bankruptcy in pro per on January 7, 2005 for unrelated reasons. At the request of the claimants, including the Scotts, who filed a Joinder, my bankruptcy case was converted to a Chapter 7 on January 21, 2005. Thus I cannot voluntarily dismiss my bankruptcy. The Scotts' state court action, including my cross-complaint against the Scotts, has been stayed ever since.

7. The Scotts never applied for relief from the bankruptcy stay to proceed to trial in their state court action against me. On January 2, 2007, the bankruptcy trustee filed an "Objection to Claim" on the Scotts' claim. A true and correct copy of same is attached hereto as Exhibit #2.

Debtor's Objection to Compromise          -18-

8. On September 10, 2007, the bankruptcy trustee filed a detailed "Trustee's Response to Claimant's Reply to Objection to Claim" on Scotts' claim. A true and correct copy of same is attached hereto as Exhibit #3.

9. Four months later on January 15, 2008, the trustee filed "Notice of Compromise of Claim" on Scotts' claim. A true and correct copy of same is attached hereto as Exhibit #4. I also filed my own Objection to the Scotts' claim.

10. In October of 2000, the Scotts obtained a mortgage on the property. Ten months later in August of 2001, the mortgage company recorded a Notice of Default against the Scotts for non-payment of their mortgage. On November 14, 2001, a Notice of Trustee's Sale was recorded against the Scotts and the property. On November 19, 2001, the Scotts filed a Chapter 13 Bankruptcy Petition in the Oakland Division, Case No. 01-46162, to delay the foreclosure. On January 10, 2002, the Scotts filed their "First-Amended Chapter 13 Plan" in their bankruptcy, in which they declared the value of their property to be $180,000. A true and correct copy of same is attached hereto as Exhibit #5. (See Exhibit #5, p. 2.)

11. Under the terms of the First-Amended Chapter 13 Plan, the Scotts were required to keep current their mortgage payments of $1,091.00 per month to their mortgage company. This they failed to do. The Scotts went into default under their Chapter 13 Plan. The Bankruptcy Court required the Scotts to resume and keep current their monthly mortgage payments as adequate protection against the trustee's sale (foreclosure sale) of their property or else the trustee's sale would proceed. The Scotts were unable or unwilling to do so. On October 17, 2002, the Scotts' creditors filed a "Notice of Motion for Relief from Stay" in which they stated that good cause exists for relief from stay

because there was no equity in the subject property for the benefit of the debtors and there was no adequate protection for the creditors. A true and correct copy of same is attached hereto as Exhibit #6. (See Exhibit #6, p. 2.)

12. On November 14, 2002, the Scotts filed a "Debtor's Request for Voluntary Dismissal of Case", thus voluntarily dismissing their bankruptcy. A true and correct copy of same is attached hereto as Exhibit #7.

13. Throughout October and November of 2002, the Scotts were actively planning to sell their property. In November of 2002 the Scotts met me for the first time. I was referred to them by Brian McKinzie of RP Real Estate, their real estate broker.

14. The Scotts' property was in a major state of disrepair and they were selling same in an "as is" condition. The Scotts' property needed extensive roof repair. The windows throughout the house were broken and needed to be replaced. The carpet was flea infested and torn, and needed to be replaced. The bathroom and the kitchen were in a desperate need for repairs and remodeling. The back of the garage, which was converted into a room, was torn down and needed to be repaired.

15. On November 18, 2002, the Scotts entered into a purchase agreement with me for the sale of their property. A true and correct copy of same is attached hereto as Exhibit #8. Said purchase agreement was a standard "Equity Purchase Agreement" on an approved real estate form, which fully complied with the requirements of Civil Code section 1695, et seq. (HESA), and it included a Notice of Right of Cancellation as required by law for properties which had foreclosure proceedings pending against them. The terms and conditions of the sale and purchase price are clearly spelled out in said purchase agreement as is customary.

16. On November 26, 2002, the five-day Right of Cancellation expired. The Scotts did not cancel or rescind within that period of time.

17. On December 6, 2002, the Scotts made an appointment to appear, and they appeared in the offices of RP Real Estate, a co-defendant in the state suit, and in the presence of Co-Defendant Nicole Wilkins and Co-Defendant Brian McKinzie of RP Real Estate, who represented the Scotts as real estate agents in this transaction. In the presence of myself and the above-referenced co-defendants and a notary public, the Scotts executed a grant deed by which they sold the property to me. A true and correct copy of same is attached hereto as Exhibit #9. Said grant deed was later recorded in the Alameda County Recorder's Office, thus I became the new owner of the property.

18. On the same date, December 6, 2002, pursuant to the Scotts' instructions, I gave a $9,000.00 cashier's check to Brian McKinzie of RP Real Estate, the Scotts real estate agent and broker. A true and correct copy of same is attached hereto as Exhibit #10.

19. Also pursuant to the Scotts' instructions, I gave a $3,300.00 cashier's check payable to Ellie Sekona, the Scotts' new landlord where the Scotts had moved. A true and correct copy of same is attached hereto as Exhibit #11).

20. The next day I received a receipt signed by Mr. Scott. A true and correct copy of same is attached hereto as Exhibit #12. This receipt showed that the balance owed the Scotts was $0.00.

21. I also paid $1,617.00 to Alameda County for the Scotts' transfer taxes. A true and correct copy of same is attached hereto as Exhibit #13.

22. I also paid off Mr. Scotts' Child Support Lien for $19,607.33 in favor of Alameda County Child Support Services, which was recorded against the property as a lien. A true and correct copy of same is attached hereto as Exhibit #14.

23. I also reinstated and paid off the Scotts' mortgage against the property, totaling $127,584.93, which is the sum of $16,904.83 to reinstate the Scotts' mortgage, plus $110,680.10 for the payoff of the Scotts' mortgage. A true and correct copy of same is attached hereto as Exhibit #15.

24. I also paid off the Scotts' delinquent property taxes in the amount of $1,761.25. A true and correct copy of same is attached hereto as Exhibit #16.

25. I also paid the Scotts' unpaid 2002 property taxes in the amount of $968.43. A true and correct copy of same is attached hereto as Exhibit #17.

26. Thus the total consideration I paid for the property was $163,838.94.

27. It is obvious that the Scotts did not exercise their right to cancel the Equity Purchase Contract within the five-day cancellation period. They voluntarily appeared at the offices of their agents and broker three weeks later. They accepted my consideration on or about December 6, 2002, well after the expiration of the cancellation period, and they voluntarily executed the grant deed in the presence of a notary and their agents after the expiration of the cancellation period. They even provided a signed receipt stating that they were paid in full.

28. Everything was fine until August 19, 2003, after the Scotts were apparently contacted by counsel familiar with my litigation in San Mateo County in an unrelated case. Counsel for the Scotts then sent RP Real Estate, LBH Realty, Nicole Wilkins,

1   Brian McKinzie, and myself a Notice of Cancellation.  A true and correct copy of same is

2   attached hereto as Exhibit #18.

3
    29.  Incredibly in said cancellation notice the Scotts demanded the return of the property
4
5   they had sold the previous year to me, now free and clear of all liens, mortgages, and

6   encumbrances, without agreeing to reimburse me for the monies I had spent and the total

7   consideration which I had paid for the property.  This Notice of Cancellation was

8   obviously defective under HESA.
9
    30.  In December of 2003 the Scotts filed a complaint by which they sought rescission
10
11  and cancellation of the Equity Purchase Agreement.  On February 18, 2004, the Scotts

12  filed their First-Amended Complaint against me and five co-defendants in Alameda

13  County Superior Court.  I also filed my cross-complaint against the Scotts and others.  No

14
    trial has been held and no judgment has been entered against me.
15
16          I declare under penalty of perjury under the laws of the United States of America

17  and the laws of the State of California, that the foregoing is true and correct.  Executed at

18  San Bruno, California on January 31, 2008.

19

20

21          _____

22          RAMIN YEGANEH,
            Debtor
23

24

25

26

27

28

Debtor's Objection to Compromise             -23-

# EXHIBIT 1

ER - 008

04/07/2005 03:36 FAX 14157323777        KLETTER & PERETZ                    ☒002

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT Northern | DISTRICT OF California | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| Ramin Yeganeh | 05-30067 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

Robert Scott and Alyssa Scott

Name and address where notices should be sent:

Kletter & Peretz
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone number: (415)732-3790

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends      a previously filed claim, dated:_____

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other fraudulent foreclosure rescue claim

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #:
  Unpaid compensation for services performed
  from _____ to _____
  (date)          (date)

**2. Date debt was incurred:**
December 6, 2002

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ TBD _____ _____ _____ TBD
(unsecured)   (secured)   (priority)   (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $ TBD

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____

Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.* DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| April 7, 2005 | *Cary G. Kletter, Esq.* |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# EXHIBIT 2

1   Charles P. Maher, CSB 124748
    LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
2   121 Spear Street, Suite 200
    San Francisco, CA 94105
3   Telephone:  (415) 356-4600
    Facsimile:  (415) 356-4610
4
    Attorneys for Andrea A. Wirum
5   Trustee in Bankruptcy

6

7

8                        UNITED STATES BANKRUPTCY COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12
                Debtor.
13

14

15                         **OBJECTION TO CLAIM**
                           **(Robert and Alyssa Scott)**
16

17          Andrea A. Wirum, Trustee in Bankruptcy of the estate of the above Debtor, hereby objects

18  to the claim of Robert and Alyssa Scott in the above case.

19          Robert and Alyssa Scott, through their counsel, filed a proof of claim in the amount of

20  $500,000.  The basis of the claim is "fraudulent foreclosure rescue;" the claim is supported by no

21  documentation.  The information received informally from the Scotts's counsel has not persuaded

22  the Trustee that a valid claim exists in the Scotts' favor.

23          Based on the Trustee's investigation, she is informed and believes that in 2002, the Debtor,

24  using an alias, executed an "Equity Purchase Agreement" by which he took title to the real

25  property commonly known as 1278 79th Avenue, Oakland, California (the "Property").  The

26  Debtor paid consideration of approximately $164,000.

27          At the time of execution of the Equity Purchase Agreement, the Property was subject to a

28  deed of trust securing a debt of approximately $125,000 in original principal amount, a child

                                         1

1   support judgment against Robert Scott of $19,607, and property taxes of about $2,700.   The

2   Debtor reinstated and paid off the secured debt ($127,000 in total) and the $19,607 judgment lien;

3   the Debtor also paid $3,300 in cash as deposit for the new home the Scotts were to rent, $9,000 to

4   the Scotts' real estate broker, and county transfer taxes.

5          The equity purchase agreement included a cancellation period of five business days.   The

6   Scotts did not exercise their right to cancel the contract within the cancellation period.   They

7   accepted the consideration from the Debtor after expiration of the cancellation period, and

8   executed the grant deed after expiration of the cancellation period.   They did not make any attempt

9   to cancel the agreement until 2004, which was apparently after they were contacted by counsel

10  who learned about litigation in the San Mateo Superior Court involving the Debtor and a number

11  of other creditors.   It appears to the Trustee that the attorneys were soliciting clients to "piggy

12  back" on findings against the Debtor in the unrelated action.

13         The Trustee is aware that the Scotts have alleged that the Debtor violated various statutes,

14  including the Home Equity Sales Act, the Foreclosure Consultants Act, and the Unfair

15  Competition law.

16         The Trustee believes that the Foreclosure Consultants Act is entirely inapplicable because

17  the Debtor did not act as a foreclosure consultant to the Scotts.   The Scotts have provided no

18  documents to suggest otherwise.

19         The Trustee believes that the Unfair Competition law allegation is based entirely on the

20  action in San Mateo County and merely an attempt by the Scotts' attorneys to bootstrap a claim

21  based on an unrelated judgment.

22         To demonstrate that the Debtor violated the Home Equity Sales Act, the Scotts must

23  demonstrate that they lost equity in the Property at the time of the transaction and therefore

24  suffered damage.   Loss of the appreciation in value between the transaction date and the present is

25  not a sufficient measure.   The value of the Property at the time minus the consideration paid is the

26  central question.   If $164,000 was not the fair market value at the time, the fair market value was

27  not substantially higher.   An appraiser for the plaintiffs in the San Mateo action did a "drive-by"

28  appraisal of the Property in early 2004 and attributed a value of $195,000 to it at that time.   The

2

ER - 012

1  appraiser did not inspect the interior.  If the Scotts suffered any damage at all, it is for less than the

2  $500,000 they allege.

3       The Trustee believes the claim of the Scotts is unenforceable under applicable law as filed

4  and should be disallowed in its entirety.

5       WHEREFORE the Trustee requests entry of an order disallowing the claim of Robert and

6  Alyssa Scott in its entirety.

7

8  DATED: January 2, 2007          LUCE, FORWARD, HAMILTON & SCRIPPS LLP

9

10                                  By: _Charles P. Maher_

11                                      Charles P. Maher
                                        Attorneys for Andrea A. Wirum, Trustee

12

13

14  211044.1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER - 013

# EXHIBIT 3

1  Charles P. Maher, CSB 124748
   LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
2  121 Spear Street, Suite 200
   San Francisco, CA 94105
3  Telephone:  (415) 356-4600
   Facsimile:  (415) 356-4610
4
   Attorneys for Andrea A. Wirum
5  Trustee in Bankruptcy
6
7
8              UNITED STATES BANKRUPTCY COURT
9           FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                  SAN FRANCISCO DIVISION
11  In re RAMIN YEGANEH,              | Case No. 05-30047 TEC
                                      | Chapter 7
12                                    |
            Debtor.                   |
13                                    | Date:   September 17, 2007
                                      | Time:   9:30 a.m.
14                                    | Place:  235 Pine Street, 23rd Floor
                                      |         San Francisco
15                                    | Court:  Hon. Thomas E. Carlson
16
17  __TRUSTEE'S RESPONSE TO CLAIMANT'S REPLY TO OBJECTION TO CLAIM__
              **(Robert and Alyssa Scott)**
18
19
20
21
22
23
24
25
26
27
28

1

2

# **TABLE OF CONTENTS**

3

4   I.   THE PROOF OF CLAIM ................................................................................. 1

5        A.   The Scotts' Proof of Claim Does Not Have Prima Facie Validity .................. 1

6        B.   The Basis of the Scotts' Claim ........................................................................ 2

7        C.   Documentary "Evidence" Offered by the Scotts .............................................. 2

8
    II.  THE TRUSTEE'S REPLY ............................................................................... 5
9
         A.   Trustee's Statement of Facts ........................................................................... 5
10
         B.   The Scotts' Secondary Theories of Liability ................................................... 7
11
         C.   The Alleged HESA Violations ........................................................................ 9
12
              1.   Which HESA Provisions Did the Debtor Violate? ................................ 9
13
              2.   Did the Scotts Suffer Damages? ........................................................... 11
14
              3.   The Scotts Are Not Entitled to Treble Damages ................................. 13
15
                   (a.)   The Contract Was Not Unconscionable .................................... 14
16
                   (b.)   Civil Code Section 1695.6(b)(3) is Not Applicable .................. 16
17
              4.   Attorney Fees ....................................................................................... 16
18
19  III.  CONCLUSION ............................................................................................... 17

20

21

22

23

24

25

26

27

28

i

ER - 016

1

2

## **TABLE OF AUTHORITIES**

3

**CASES**                                                                                              **Page No.**

4

*Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006).........................8

5

*Circuit City Stores, Inc. v. Mantor*, 335 F. 3d 1101 (9th Cir. 2003) *cert. den.*

6

    540 U.S. 1160..................................................................................................................................14

7

*Drew v. Equifax Information Services*, 2007 U.S. Dist. Lexis 53157 (N.D. Cal. 2007)................8

8

*Ilkhchooyi v. Best*, 37 Cal. App. 4th 395, 45 Cal. Rptr. 2d 766 (Fourth Dist. 1995) ....................15

9

*Ingle v. Circuit City Stores, Inc.*, 328 F. 3d 1165 (9th Cir. 2003), *cert. denied*, 540 U.S.

10

    1160, 124 S. Ct. 1169 ..................................................................................................................14

*In re Los Angeles International Airport Hotel Associates*, 196 B.R. 134, 139

11

    (9th Cir. B.A.P. 1996) ....................................................................................................................1

12

*Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 27 Cal. Rptr. 3d

    797, *rev. den.* (Fourth Dist. 2005) ................................................................................................14

13

*Segura v. McBride*, 5 Cal. App. 4th 1028, 1038, 7 Cal. Rptr. 436 (First Dist. 1992)........11, 12, 13

14

15

Foreclosure Consultant Law ("FCL," Cal. Civ. Code Sections 2945.1 et seq.) ........................2, 7

16

Home Equity Sales Contracts Act ("HESA," Cal. Civ. Code Sections 1695 et seq.).2, 7, 9, 11, 13

17

Unfair Competition Law (Cal. Bus. And Prof. Code Sections 17200 et seq.)............................2, 7

18

19

Business and Professions Code Section 17200 ..............................................................................8

20

Business and Professions Code Section 17203 ..............................................................................8

21

Business and Professions Code Section 17204 ..............................................................................8

22

23

11 U.S.C. § 726(a)(4) ...................................................................................................................16

24

25

Civil Code Section 1670.5 ...........................................................................................................14

26

Civil Code Section 1695 ................................................................................................................9

27

Civil Code Section 1695.2 ...........................................................................................................15

28

ii

Civil Code Section 1695.3 ........................................................................ 15

Civil Code Section 1695.3(a) ................................................................... 10

Civil Code Section 1695.3(c) ................................................................... 10

Civil Code Section 1695.3(d) .................................................................. 11

Civil Code Section 1695.3(h) .................................................................. 10

Civil Code Section 1695.4 ........................................................................ 15

Civil Code Section 1695.5 ................................................................. 10, 15

Civil Code Section 1695.6 ................................................................... 9, 15

Civil Code Section 1695.6(b)(3) ...................................................... 14, 16

Civil Code Section 1695.7 ......................................................... 13, 14, 16

Civil Code Section 1695.13 ............................................................. 14, 15

Civil Code Section 1695.14 ...................................................................... 16

Civil Code Section 1695.14(d) ................................................................ 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1        Andrea A. Wirum, Trustee in Bankruptcy of the estate of the above Debtor, hereby

2    responds to the opposition of Robert and Alyssa Scott to the Trustee's objection to their claim.

3    I.    THE PROOF OF CLAIM

4        A.    The Scotts' Proof of Claim Does Not Have *Prima Facie* Validity

5        The Scotts filed a proof of claim for $500,000 on April 28, 2005; no documentation was

6    attached to the proof of claim form.    The stated basis for the Scotts' claim is "fraudulent

7    foreclosure rescue claim." An authentic copy of the proof of claim is attached as Exhibit A to the

8    Declaration of Charles P. Maher. If a proof of claim is based on a writing and the writing is not

9    attached, the claim is not entitled to *prima facie* validity. *In re Los Angeles International Airport*

10   *Hotel Associates*, 196 B.R. 134, 139 (9th Cir. B.A.P. 1996).    The Scotts' claim is based on a

11   writing called the "Equity Purchase Agreement," which was not attached. The Scotts' proof of

12   claim does not have *prima facie* validity.

13       The Scotts' claim relates to their transfer to the Debtor of real property in Oakland,

14   California, known as 1278 79th Avenue (the "Property") through an equity purchase agreement in

15   2002.    The Scotts allege that, at the time of the transfer, the Property had substantial value in

16   excess of the consideration given by the Debtor and that the conveyance caused them great

17   economic loss.    As a result, the Scotts allege the Debtor is liable for damages under a number of

18   statutes and common law theories.

19       Informally, the Scotts have provided the Trustee with some documents to support their

20   claim; however most of the documents are unsupported argument.    In their opposition to the

21   Trustee's objection, the Scotts have provided the Court with many of the same documents. The

22   Scotts have not provided any persuasive evidence that the value of the Property exceeded the

23   $163,000 consideration given by the Debtor in December 2002 or that the Scotts would have been

24   able to retain the Property by avoiding foreclosure. The value of the Property in December 2002

25   is the crucial fact for determining whether the Scotts suffered economic harm in 2002. If they did

26   not suffer economic harm, their claim should be disallowed.    As explained below, the Scotts had

27   only a few days to negotiate and close a sale to another buyer.

28

1    The Trustee contends that the value of the Property at the time of the sale was not

2    significantly more than the consideration the Debtor gave; hence, if the Scotts can demonstrate

3    that they could have averted a foreclosure, the Scotts suffered damage in an amount that is far less

4    than they claim.  At $500,000, their claim is grossly overstated.  The Scotts' claim should be

5    disallowed in its entirety or substantially reduced.

6    B.    The Basis of the Scotts' Claim

7    The Scotts have alleged that the Debtor is liable to them under the Home Equity Sales

8    Contracts Act ("HESA," Cal. Civ. Code Sections 1695 et seq.), the Foreclosure Consultant Law

9    ("FCL," Cal. Civ. Code Sections 2945.1 et seq.), the Unfair Competition Law (Cal. Bus. And

10   Prof. Code Sections 17200 et seq.), and various tort theories.  The Trustee's fundamental position

11   is that the Scotts suffered little or no economic harm and cannot recover damages or damages in

12   the amount they seek under any theory.

13   The Scotts' opposition is based to a great degree on the conduct of others (e.g., Nicole

14   Wilkins) or conduct of the Debtor that is unrelated to the Scotts.  The Trustee does not defend the

15   Debtor's conduct in other situations; she simply argues that the only conduct relevant to the

16   Scotts' claim is the Debtor's alleged conduct concerning the Scotts.

17   A question that cuts across all of the Scotts' liability theories is whether the Scotts suffered

18   damage from their contract with the Debtor and, if so, how much.  The Trustee will demonstrate at

19   trial that at the time the grant deed conveying the Property was signed and recorded, a foreclosure

20   was imminent and inevitable, and the Debtor paid fair market value or close to it at the time.  If

21   the Trustee succeeds in making this showing, the Scotts' claim will be disallowed or drastically

22   reduced.

23   C.    Documentary "Evidence" Offered by the Scotts

24   In opposition to the Trustee's objection, the Scotts have filed the Declaration of Cary

25   Kletter with its exhibits, a Request for Judicial Notice by which the Scotts seek judicial notice of a

26   number of the documents attached to Mr. Kletter's declaration and a declaration executed by

27   Robert Scott in June 2004 in a proceeding in Alameda County.

28

2

1    The following documents are attached to the Kletter declaration:

2    (a)    Exhibit A:  First Amended Complaint in Alameda Superior Court.

3    (b)    Exhibit B:  November 2004 grant deed from Allied Management Trust to K.

4    Yeganeh.

5    (c)    Exhibit C:  November 30, 2006, settlement letter from Charles Maher to Cary

6    Kletter.

7    (d)    Exhibit D:   December 15, 2006, settlement letter from Yosef Peretz to Charles

8    Maher.  Attached to the December 15, 2006, letter are the following exhibits:

9    1.    Documents from Zillow.com:   "Zestimate" dated sometime in

10          2006 and list of "comparables" also dated 2006. (Exh. A to letter)

11    2.    May 20, 2006, comparative market analysis prepared by Sheila

12          Broxcrawford of Century 21-Heritage Real Estate.  (Exh. B to

13          letter)

14    3.    Equity Purchase Agreement. (Exh. C to letter)

15    4.    Same documents identified in No. 1 above. (Exh. E to letter; n.b.,

16          there is no Exh. D to letter)

17    5.    Same documents as in No. 2 above. (Exh. F to letter)

18    6.    Same document as in No. 3 above. (Exh. G to letter)

19    7.    Request for Entry of Default and Default of Brian McKinzie

20          individually and dba LBH Real Estate Investments, and R.P. Real

21          Estate, LLC. (Exh. H to letter)

22    8.    Settlement Agreement (Scotts and Nicole Wilkins).  (Exh. I to

23          letter)

24    9.    Copy of complaint, *Cheatham v. R. Rad*. (Exh. J to letter)

25    10.   Pages 9-14 of a transcript of court proceedings in the Cheatham

26          case. (Exh. K to letter)

27    11.   Order approving fees for Luce, Forward dated June 26, 2006.

28          (Exh. L to letter)

3

1          12.    Order approving fees for Luce, Forward dated December 22, 2006.

2               (Exh. M to letter)

3          13.    Order approving fees of Former Trustee dated December 22, 2006.

4               (Exh. N to letter)

5          14.    Order approving fees for Bachecki, Crom & Company dated

6               December 22, 2006. (Exh. O to letter)

7          15.    Grant Deed recorded December 6, 2002. (Exh. P to letter)

8     The following documents are attached to Robert Scott's June 9, 2004, declaration:

9       (a)    Exhibit A:  Agreement to Purchase Real Estate dated November 21, 2002.

10      (b)    Exhibit B:  Notice of Cancellation and Rescission of Home Equity Sales Contracts

11 dated August 21, 2003.

12     In their "factual background" section, the Scotts make 22 citations to the record they have

13 presented in support of their claims under various theories.  Of those 22 citations, 16 are to

14 allegations in the Scotts' first amended complaint and have no evidentiary weight.

15     The six statements disputed but supported by arguably competent evidence are the

16 following:

17      (1)    "At that time WILKINS made material misrepresentations and omitted
crucial facts regarding the purchase offer." (Scott Memorandum, 2: 9-10);

18

19      (2)    "WILKINS told the SCOTTS that she and the 'investor' were the only
people who could prevent the foreclosure of their home." (Scott
Memorandum, 2: 16-17);

20

21      (3)    "The SCOTTS later found out that at their meeting with YEGANEH they
signed a blank form of an equity purchase agreement ("EQUITY
PURCHASE AGREEMENT") which had numerous blank spaces, was not

22               complete and provided that they would sell their home to YEGANEH."
(Scott Memorandum, 2: 21-25);

23

24      (4)    "The grant deed was recorded the same day the SCOTTS executed it,
December 6, 2002, with the Alameda County Recorders Office." (Scott
Memorandum, 3: 13-14);

25

26      (5)    "Had the SCOTTS known these facts, they would never have trusted
YEGANEH, and certainly would not have agreed to sell their home to
him." (Scott Memorandum, 4: 12-13); and

27

28      (6)    "On November 29, 2004, the SUBJECT PREMISES was transferred to K.
Yeganeh, YEGANEH's father, who claims to be the Trustee of the

1    TRUST.  This transfer was recorded on February 22, 2005."  (Scott
2    Memorandum, 4: 16-19).

3  II.    THE TRUSTEE'S REPLY

4        A.    Trustee's Statement of Facts

5        In October 2000, the Scotts borrowed money and secured the loan with a deed of trust

6  against the Property.  Ten months later, in August 2001, the lender recorded and published a

7  Notice of Default.  On November 14, 2001, the trustee under the deed of trust published a Notice

8  of Trustee's Sale.  An authentic copy of the Notice of Trustee's Sale is attached as Exhibit B to the

9  Declaration of Charles P. Maher.

10        On November 19, 2001, the Scotts filed a voluntary petition under Chapter 13 (Case No.

11  01-46162) in this Court's Oakland Division.  The Scotts were represented by counsel.  Maher

12  Declaration, ¶ 4.  At the time, the Scotts were eight payments in arrears, for a total of $10,440.60.

13  Maher Declaration, ¶ 5.  By the Trustee's calculation, by the time they filed their Chapter 13

14  petition, the Scotts had missed more loan payments than they had made.

15        According to their Schedule A, their Chapter 13 Plan filed on November 19, 2001, and

16  their First Amended Chapter 13 Plan, the value of the Property was $180,000 in November 2001.

17  According to the docket in the Scotts' Chapter 13 case, no party objected to the value; as a result

18  the value was binding on creditors and the Scotts.  Maher Declaration, ¶¶ 4, 5 and Exhibits C, D,

19  E, and F.

20        Under the terms of the First Amended Plan; the Scotts were required to maintain current

21  payments of $1,091 per month to their lender.  Maher Declaration, Exhibit F.  The Scotts made a

22  number of payments, but they failed to make their August 2002, September 2002, and October

23  2002, payments, which prompted the lender to file a motion for relief from the stay.  As of the

24  date of the motion, the Scotts had $10,044.60 in prepetition arrearages and $3,439.17 in post-

25  petition arrearages.  Maher Declaration, Exhibit G.  The Scotts also went into default under their

26  plan.  Maher Declaration, Exhibit H.

27        In ruling on the lender's motion, the Bankruptcy Court required the Scotts to resume their

28  monthly payments as adequate protection for the lender and required the Scotts to make up the

5

1  delinquent post-petition payments (four by the time of the hearing) in the following six month

2  period (i.e., by May 8, 2003). If they failed to do so, the lender was authorized to complete its

3  trustee's sale. Maher Declaration, Exhibit I.

4      The Trustee is informed and believes that the Scotts were unable to make any additional

5  payment and elected instead to dismiss their Chapter 13 petition. They filed a request for

6  dismissal of their case on November 14, 2002. Maher Declaration, Exhibit J. The order was

7  signed on December 2, 2002. Maher Declaration, Exhibit K.

8      On November 18, 2002, the Scotts and the Debtor (using the name "R. Rad") executed the

9  equity purchase agreement. An authentic copy of the equity purchase agreement is attached to the

10  Kletter Declaration as Exhibit C. The equity purchase agreement describes total consideration of

11  $160,000:  $15,000 cash, payment of a $20,000 judgment lien against Robert Scott, and

12  assumption of a $125,000 loan.

13      Nine days later, on November 27, 2002, the Scotts executed a separate "Agreement to

14  Purchase Real Estate with R.P. Real Estate;" the Debtor was not a party to this agreement. An

15  authentic copy of the Agreement to Purchase Real Estate is attached to the Maher Declaration as

16  Exhibit L. By this agreement, the Scotts purported to sell the Property to R.P. Real Estate in

17  exchange for $2,000 in cash, assumption of the loan secured by the first deed of trust, and

18  payment of the child support judgment against Robert Scott. The Trustee is informed and believes

19  that the Debtor was not connected to this agreement and was not affiliated with R.P. Real Estate.

20      On December 6, 2002, the Scotts executed a grant deed in favor of the Debtor; the grant

21  deed was recorded the same day in the Official Records of Alameda County. In consideration for

22  the transfer, the Debtor (a) gave the Scotts a $3,300 cashier's check made payable to Ellie Sekona,

23  the Scotts's new landlord; (b) gave a cashier's check for $9,000 to Brian McKinzie; (c) delivered a

24  cashier's check in the amount of $19,607.33 to the Alameda County District Attorney's office to

25  satisfy the child support judgment against Mr. Scott; (d) paid $1,761.25 in delinquent property

26  taxes and $968.43 for current property taxes for the 2002/2003 tax year; (e) paid $1,617 in county

27  transfer tax; (f) reinstated the loan by paying $16,904.83; and (g) shortly after the grant deed was

28  recorded, paid off the loan secured by the first deed of trust ($110,680.10). The total

1    consideration was $163,839. Maher Declaration, ¶¶ 9, 10, and Exhibit M.

2        The following year, on August 19, 2003, Yosef Peretz, counsel for the Scotts, sent R.P.

3    Real Estate, persons affiliated with R.P. Real Estate, and the Debtor a Notice of Cancellation

4    and/or Rescission of the Agreement to Purchase Real Estate between the Scotts and R.P. Real

5    Estate and the Equity Purchase Agreement between the Scotts and the Debtor. Authentic copies

6    of the notice and the recorded notice of cancellation are attached collectively as Exhibit B to the

7    Declaration of Robert Scott filed in support of the Scotts' claim.

8        In December 2003, the Scotts filed a complaint by which they sought rescission of the

9    Equity Purchase Agreement and damages under various theories. On February 18, 2004, the

10   Scotts filed their first amended complaint, a copy of which is attached to the Kletter Declaration as

11   Exhibit A.

12       B.    The Scotts' Secondary Theories of Liability

13       The Scotts' primary claim is based on the Debtor's alleged violation of the Home Equity

14   Sales Contract Act ("HESA"). The Trustee's argument in opposition to the HESA claim is

15   addressed in detail in Section D below. The Scotts' other theories are not as fully developed and

16   do not require as thorough an analysis.

17       It is the Trustee's position that there is insufficient evidence to support claims against the

18   Debtor under the Foreclosure Consultant Law or the Unfair Competition Law. The documents

19   and other evidence provided by the Scotts demonstrate not that the Debtor was acting as a

20   foreclosure consultant, but that the Debtor was acting as a buyer of equity on his own account.

21   The Scotts allege that persons other than the Debtor offered to help them but the Scotts have not

22   offered or identified sufficient evidence to link the activities of others to the Debtor or

23   demonstrated that the Debtor acted as a foreclosure consultant. Robert Scott's statement that two

24   weeks after the Scotts signed the equity purchase agreement the Debtor "informed my wife and I

25   that he was familiar with real estate loans and that he was going to help us by assuming our

26   mortgage" is not enough to demonstrate that the Debtor was acting as a foreclosure consultant.

27   (Scott Decl., ¶ 18) The statement seems manufactured to fit the Scotts' allegations.

28

1    The Scotts' Unfair Competition Law claim under Business and Professions Code Section
2    17200 is based primarily on the Section 17200 complaint filed against the Debtor in 1999 in San
3    Mateo County by other creditors of the estate. The Scotts were not parties to that action which
4    was based on events that took place in the 1990s and did not involve them. The Scotts' general
5    claims that the Debtor used assumed names "to deceive the public" and engage in other unlawful
6    conduct related to other homeowners, other properties, and other plaintiffs, not the Scotts.

7    Section 17204 of the California Business and Professions Code limits standing under
8    Section 17200 to a "person who has suffered injury in fact and has lost money or property as a
9    result of such unfair competition." *Drew v. Equifax Information Services*, 2007 U.S. Dist. Lexis
10   53157 (N.D. Cal. 2007). Although California law previously permitted any person acting for the
11   general public to sue for relief from unfair competition, Proposition 64 in 2004 amended the law
12   to require that any plaintiff have "suffered injury in fact and [have] lost money or property as a
13   result of unfair competition." Cal. Bus. & Prof. Code Section 17203. The California Supreme
14   Court's decision in *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227
15   (2006) held that these requirements apply to cases pending at the time Proposition 64 became
16   effective.

17   In this case, the Scotts do not have standing to rely on the activities and conduct of the
18   Debtor which do not affect them and which caused them no harm. Even if the Scotts did have
19   standing to assert such a claim, the claim would be of no value to them because the remedies
20   available under Section 17203 are restitution of money or property acquired in violation of the
21   statute, and attorney fees are not recoverable under Section 17200. The Scotts cannot prevail
22   under their Unfair Competition law theory.

23   The Scotts allege that the Debtor is liable to them for common law fraud and lists the five
24   elements of a fraud claim:  (1) misrepresentation;  (2) knowledge of the falsity of the
25   representation; (3) intent; (4) justifiable reliance; and (5) resulting damage.

26   Claims based on fraud must be pled with specificity. The Scotts state that "YEGANEH
27   made numerous false misrepresentations to the SCOTTS" but do not identify what those
28   misrepresentations were. The Scotts' fraud claim fails on this ground alone. The Scotts argue that

1    they relied on the unidentified misrepresentations "by executing the sales contracts and related

2    documents."  Even if the Scotts identify specific misrepresentations and demonstrate that they

3    executed documents in justifiable reliance on them, they must satisfy element number 5: did they

4    suffer any damage?  The answer is no.

5         C.     The Alleged HESA Violations

6              1.     Which HESA Provisions Did the Debtor Violate?

7         Section 1695 <u>et seq</u>. of the California Civil Code imposes numerous restrictions on

8    purchasers of equity in homes that are in foreclosure and penalties for violations of the

9    restrictions.  The Scotts allege in their opposition memorandum (pages 6-7) that the Debtor

10   violated virtually every provision, identifying as subparagraphs (a) through (h) eight specific

11   violations by Civil Code section. They do not support the allegations with citations to evidence,

12   however.  An examination of the evidence they cite elsewhere reveals that most of the allegations

13   are unsupported.  Some of the alleged violations are plainly false.

14        For the convenience of the Court, each allegation made by the Scotts is quoted below

15   followed by the Trustee's brief response:

16        (a)     Allegation: "Accepting from the SCOTTS and executing the Grant Deed
     before the statutory cancellation period had elapsed, as required by Civil
17                   Code §1695.6."

18                   Response:  The allegation is false.  The equity purchase agreement is
     dated November 18, 2002, and appears to have been executed on that day.
19                   The grant deed was executed on December 6, 2002.   The statutory
     cancellation period expired on November 25, 2002.  The Scotts' allegation
20                   that they signed the equity purchase agreement (in an incomplete form) in
     February 2003 makes no sense.  If the Debtor had already paid all of the
21                   consideration in December 2002, why would the terms of the equity
     purchase agreement not conform precisely to the consideration already
22                   paid? See Maher Declaration, Exhibit O.

23        (b)     Allegation: "Recording the Grant Deed before the statutory cancellation
     period had elapsed, as required by Civil Code §1695.6."
24
                     Response:  This allegation is false.  The statutory cancellation period for
25                   the equity purchase agreement expired on November 25, 2002.  The grant
     deed was executed on December 6, 2002, and recorded the same day.
26
          (c)     Allegation: "Failing to pay the SCOTTS the contractual consideration,
27                   and by making misleading statements regarding the sale, prior to the end
     of the time provided for cancellation of a sale of residence and in
28                   foreclosure, as required by Civil Code §1695.6."

1       Response: This allegation is unsupported. The contractual consideration
        was $160,000. The Debtor paid all of the consideration and more: the
2       Debtor cured arrearages and paid off the debt secured by the first deed of
        trust ($127,585). The Debtor paid $19,607 to satisfy the judgment for
3       child support against Robert Scott. The Debtor paid a total of $2,730 in
        property tax. The Debtor paid $3,300 for the benefit of the Scotts to their
4       new landlord. The Debtor paid $9,000 to Brian McKinzie at LBH Realty
        on behalf of the Scotts. The Debtor paid $1,617 in transfer tax. The sum
5       of these payments is $163,839. The declaration of Robert Scott does not
        support allegations that the Debtor made misleading statements regarding
6       the sale "prior to the end of the time provided for cancellation." In fact,
        Mr. Scott declares that "at the December 6, 2002, meeting my wife and I
7       met the 'investor' for the first time." Scott Declaration, 3: 16. Mr. Scott
        asserts that the equity purchase agreement was not executed on November
8       18, 2002, but in February 2003, two months after the grant deed was
        recorded and the consideration paid which makes no sense as explained in
9       response to allegation (a) above.

10  (d)  Allegation: "Failing to provide the SCOTTS with the total consideration
         to be given for the SUBJECT PREMISES as part of the sale, as required
11       by Civil Code §1695.3(c)."

12       Response: This allegation is false. As noted in the response to allegation
         (c) above, the Debtor paid the total consideration.
13

14  (e)  Allegation: "Failing to provide the SCOTTS with a separate written
         notice of the statutory right to cancel any agreement for the purchase of
15       the SUBJECT PREMISES within 5 business days as required by Civil
         Code §1695.5."

16       Response: Section 1695.5 does not require a "separate written notice" of
         the right to cancel. It makes reference to such a notice being "attached" to
17       the equity purchase agreement. The equity purchase agreement contained
         the statutory notice of cancellation language at the bottom of the second
18       page, with a broken line indicating where the bottom portion of the page
         could be "detached" or cut with scissors. The copy of the equity purchase
19       agreement provided by the Scotts as Exhibits C and G to the Kletter
         declaration makes clear that there was substantial compliance with Section
20       1695.5.

21  (f)  Allegation: "Failing to provide the SCOTTS with a written notice
         informing of their right to refrain from signing any instruments of
22       conveyance until the cancellation period had elapsed according to
         §1695.3(h)."
23

24       Response: This allegation is false. The applicable notice appears
         approximately two inches below the Scotts' signatures on the equity
25       purchase agreement.

26  (g)  Allegation: "Failing to provide the SCOTTS with the name, business
         address, and the telephone number of the purchaser of the SUBJECT
27       PREMISES, as required by Civil Code §1695.3(a)."

28       Response: This allegation is false in part. The equity purchase agreement
         contains this information immediately to the left of the Scotts' signatures

on page 2 of the agreement.  The Trustee acknowledges that the Debtor used the assumed name "R. Rad."

(h)    Allegation:    "Failing to provide the SCOTTS with the complete description of the terms of payments and any other consideration paid for the purchase of the SUBJECT PREMISES as required by Civil Code §1695.3(d)."

Response:    The Scotts have alleged that they signed a blank equity purchase agreement in February 2003 and that the Debtor added numbers to the form contract later.  This allegation makes little sense in light of the actual consideration paid by the Debtor two months earlier and the form in which the consideration was paid.  The equity purchase agreement provides that the Debtor would make a $15,000 cash payment in escrow, assume a $125,000 secured obligation, and assume or pay a $20,000 judgment lien.  The arrearages on the loan were listed as unknown but the $125,000 loan amount was approximately equal to the total of the actual principal and arrearages ($127,585).  The $19,607 paid to satisfy the child support lien approximated the $20,000 attributed to this lien in the equity purchase agreement.  The only anomaly is the $15,000 cash payment noted in the equity purchase agreement.  If, as the Scotts allege, the contract terms were filled in after they signed it, why would the Debtor not have accurately described what he paid for the benefit of the Scotts ($3,300 to their landlord, $9,000 to Mr. McKinzie, and $1,761 in delinquent property tax)?  The total amount the Debtor paid ($163,839) was somewhat higher than the amount identified in the equity purchase agreement.

The evidence the Scotts have presented to support their claim, including the equity purchase agreement itself, actually contradicts their allegations in many respects.  Furthermore, the Scotts do not once disclose their Chapter 13 proceeding, their eight-payment delinquency in November 2001 when they filed their Chapter 13 petition, their post-petition delinquency in the fall of 2002, their failure to make a single adequate protection payment as required by the Bankruptcy Court, and the certainty they would lose the Property in a matter of days because the lender had only to schedule a trustee's sale.  The Scotts' voluntary dismissal of their Chapter 13 case was an acknowledgement that they could not possibly hold on to the Property.

2.    Did the Scotts Suffer Damages?

If there were HESA violations, what damage did they cause the Scotts?  Damages for lost equity are determined at the date of the alleged violation.  *Segura v. McBride*, 5 Cal. App. 4th 1028, 1038, 7 Cal. Rptr. 436 (First Dist. 1992).  If the seller seeks damages for lost appreciation, the seller must include proof that it would have had a colorable chance of holding on to the

1   property to realize the appreciation. *Id.* at 1039.

2          The Trustee contends that the Scotts lost no equity and suffered no damage, or lost equity

3   in an amount substantially less than the Scotts allege and which they would have lost anyway due

4   to their inability to hold on to the Property. In their opposition memorandum, the Scotts attribute a

5   value of "no less than $300,000" to the Property at the time of the violation (Opposition Memo.,

6   12: 7). However, Robert Scott asserts in his declaration that the Property was worth $240,000

7   (Scott Declaration, 6: 5).

8          The Scotts' omission of any mention of their Chapter 13 proceeding rises to the level of

9   dishonesty. The Scotts were bound to their value of $180,000 during their Chapter 13 proceeding.

10  That value is evidence of the Property's value no earlier than one year before the Equity Purchase

11  Agreement was signed (and title to the Property was conveyed). Had the Scotts disclosed the

12  Chapter 13 to this Court, they would have had to explain the remarkable 33 percent appreciation

13  (from $180,000 to $240,000 according to Mr. Scott's declaration) or the spectacular 67 percent

14  appreciation (from $180,000 to $300,000 according to the Scotts' memorandum), all in one year's

15  time.

16         The Scotts state that they have provided the Court with an appraisal of the Property. See

17  Opposition Memorandum, 11: 13-15. They have not. The "evidence" they offer is a 2006 print-

18  out from "Zillow.com" and a list of comparables from 2006 compiled by a realtor named Sheila

19  Broxcrawford. Zillow.com does not provide appraisals. Attached as Exhibits N and O to the

20  Declaration of Charles P. Maher are two print-outs dated May 2, 2007, from Zillow.com's

21  website: "Overview" and "Zestimate." Zillow.com "is an online real estate service dedicated to

22  helping you get an edge in real estate by providing you with valuable tools and information."

23  Maher Declaration, Exhibit N. "The Zestimate is not an appraisal and you won't be able to use it

24  in place of an appraisal ... ." Maher Declaration, Exhibit O. The list of comparables compiled by

25  the realtor is based primarily on listing prices from 2006. This list is not dispositive of 2002

26  values for the purported comparables or for the Property.

27         The actual value of the Property is subject to determination by the Court after

28  consideration of evidence later in this proceeding. In addition to the Scotts' admission of a

1    $180,000 value one year earlier, the Trustee has other evidence of value of the Property before

2    2006. On or about March 4, 2004, counsel for the San Mateo plaintiffs obtained a declaration of

3    appraiser Alison Teeman. An authentic copy of the Teeman Declaration is attached as Exhibit P

4    to the Maher Declaration.

5         Based on the opinion of Ms. Teeman in early 2004 (i.e., about 13 months after the transfer

6    and 28 months before the "Zestimate"), the value of the Property in early 2004 was $195,000. At

7    the Trustee's request, Ms. Teeman has opined that the Property was worth $190,000 in December

8    2002. If the Court determines that the Debtor violated HESA, accepts Ms. Teeman's valuation,

9    and finds that the Debtor paid less than he should have, the compensatory damages are no more

10   than $26,000.

11        If the Scotts succeed in showing that the Debtor violated HESA and that they suffered

12   damages from the violation at the time, they are not entitled to damages for lost appreciation

13   because they have failed to demonstrate that they had a colorable chance of averting foreclosure

14   and keeping the Property to realize any appreciation. *Segura*, 5 Cal. App. 4th at 1039. The Scotts

15   do not even acknowledge this requirement.

16        The Scotts were delinquent eight payments before they filed their Chapter 13 petition in

17   2001; this delinquency resulted in the publication of a notice of default and a notice of sale. The

18   approaching trustee's sale prompted the Scotts to file their Chapter 13 petition. The Scotts fell

19   behind on post-petition payments, leading to an order for adequate protection payments and

20   complete relief from the stay for the lender; their failure to make adequate protection payments as

21   ordered by the Bankruptcy Court, and their resulting voluntary dismissal of the Chapter 13

22   proceeding lead to the following conclusion: foreclosure was inevitable and imminent. The

23   Scotts had no chance of retaining the Property and are not entitled to lost appreciation.

24              3.     The Scotts Are Not Entitled to Treble Damages

25        If the Scotts fail to demonstrate that they suffered actual damages, the question of treble

26   damages is never reached. Even if the Scotts do succeed in establishing actual damages, treble

27   damages under Section 1695.7 are not available.

28

1        The Scotts claim that they are entitled to treble damages under Civil Code Section 1695.7.

2    They are not. Section 1695.7 limits treble damages to (a) transactions found to be unconscionable

3    under Section 1695.13 and (b) transactions that include a violation of Section 1695.6(b)(3) which

4    prohibits a subsequent transfer or encumbrance of any interest in the property to any third party

5    (or purported transfer or encumbrance).

6                      (a)     The Contract Was Not Unconscionable

7        The Scotts allege that the Debtor violated Section 1695.13 of the Civil Code which

8    prohibits unconscionable transactions. Civil Code Section 1695.13 prohibits transactions if "by

9    the terms of such transaction, [the equity purchaser] takes unconscionable advantage of the

10   property owner in foreclosure." What constitutes unconscionability in a contract is set forth in

11   Section 1670.5 of the California Civil Code. The Scotts do not demonstrate how the Debtor took

12   unconscionable advantage of them. Based on the facts of the transaction, the Trustee believes the

13   Scotts cannot do so.

14       Under California law, unconscionability in a contract refers to an absence of meaningful

15   choice on the part of one of the parties, together with contract terms that are unreasonably

16   favorable to the other party. *Ingle v. Circuit City Stores, Inc.*, 328 F. 3d 1165 (9th Cir. 2003), *cert.*

17   *denied*, 540 U.S. 1160, 124 S. Ct. 1169. As the Scotts note, unconscionability has both procedural

18   and substantive elements. Both elements must be present to invalidate a clause in a contract as

19   unconscionable.

20       The procedural element of unconscionability is present if there is a showing of oppression

21   arising from an inequality of bargaining power that results in no real negotiation and an absence of

22   meaningful choice, plus surprise involving the extent to which supposedly agreed-upon terms of

23   the bargain are hidden in a long, printed-form contract drafted by the party seeking to enforce the

24   disputed terms. Numerous cases stand for this proposition in California. *Morris v. Redwood*

25   *Empire Bancorp*, 128 Cal. App. 4th 1305, 27 Cal. Rptr. 3d 797, *rev. den.* (Fourth Dist. 2005);

26   *Circuit City Stores, Inc. v. Mantor*, 335 F. 3d 1101 (9th Cir. 2003) *cert. den.* 540 U.S. 1160.

27       The equity purchase agreement signed by the Scotts was a standard form contract that was

28   not drafted by the Debtor: its essential terms are mandated by statute. *See* Cal. Civ. Code

1    §§1695.2, 1695.3, 1695.4, 1695.5, and 1695.6. The form agreement is only two pages long. The
2    equity purchase agreement does not include any element of surprise; there are no hidden terms. If
3    there was unequal bargaining power (which the Trustee does not concede) or an absence of
4    meaningful choice, these elements exist because of the circumstances of the pending foreclosure;
5    the Scotts created these circumstances for themselves by falling 13 payments behind, failing to
6    successfully defend against the lender's motion for relief from stay, and failing to make any
7    adequate protection payments as required by the Bankruptcy Court's order. The element of
8    procedural unconscionability is missing.

9        The element of substantive unconscionability requires the Scotts to show terms that are
10   one-sided, lack justification, and reallocate risks of the bargain in an objectively unreasonable or
11   unexpected manner. *Ilkhchooyi v. Best*, 37 Cal. App. 4th 395, 45 Cal. Rptr. 2d 766 (Fourth Dist.
12   1995). The terms of the equity purchase agreement are mandated by statute; they are not one-
13   sided and do not lack justification. The agreement does not reallocate risks of the bargain in an
14   objectively unreasonable or unexpected manner. The substantive element of unconscionability is
15   missing, too.

16       Ignoring the Scotts' failure to establish that the equity purchase agreement was an
17   unconscionable contract, was the consideration given by the Debtor unconscionably low? The
18   Trustee believes it was not, based on the actual economic results of the transaction.

19       The Property was subject to a second priority, involuntary lien in favor of Alameda County
20   that secured a judgment against Robert Scott for unpaid child support. Foreclosure by the lender
21   in first priority position would have extinguished the child support judgment lien, but not the
22   underlying debt, which was not dischargeable. The Debtor paid $19,607.33 to satisfy that debt.

23       The Debtor also paid $3,300 to the landlord for the Scotts' new home and $9,500 to Brian
24   McKinzie in satisfaction of a debt it appears the Scotts owed him.

25       The Debtor would have been better off economically if he had waited for the inevitable
26   trustee's sale – he could have purchased the Property for $128,000, instead of $164,000.

27       The Trustee does not believe the Debtor took unconscionable advantage of the Scotts and,
28   therefore, did not violate Section 1695.13. However, if the Court determines that the $164,000

1  consideration was unconscionably low in light of a $190,000 value, and the Scotts are entitled to

2  treble damages, the trebled amount appears to be about $78,000.  Of that sum, the multiple

3  ($52,000) would be subordinated under 11 U.S.C. § 726(a)(4) for purposes of distribution.

4          (b)      Civil Code Section 1695.6(b)(3) is Not Applicable

5       The Trustee acknowledges that the Debtor did purport to transfer title to the Property to

6  Allied Management Trust, which was not a bona fide purchaser for value, and Allied purported to

7  transfer the Property to the Debtor's father.  A violation of Section 1695.6(b)(3) did occur.

8  However, the Trustee contends that the Court's avoidance of the transfers by judgment dated July

9  30, 2007, nullified the violation and vindicates the policy that underlies Section 1695.6(b)(3).

10       Section 1695.6(b)(3) punishes the equity purchaser who puts the purchased property

11  beyond reach of the Court when rescission of the transaction would have been the appropriate

12  remedy.  In the Trustee's adversary proceeding against Allied Management Trust, the Court has

13  entered judgment avoiding the fraudulent transfer of the Property and revesting title in the estate;

14  the Property has been preserved for the benefit of the estate.  The Trustee is in a position to

15  reconvey title to the Scotts in a rescission if the Court were to order it.  The policy underlying

16  Section 1695.7 has been served and treble damages should not be awarded on the basis of Section

17  1695.7.

18       4.     Attorney Fees

19       The final question is whether an award of attorney fees may be appropriate.  Civil Code

20  Section 1695.14 provides for an award of reasonable attorney fees and costs to the prevailing party

21  in an action for rescission.  Cal. Civ. Code §1695.14(d).  The Scotts are seeking a substantial

22  attorney fee award in a situation in which the Court may find no damages or damages in a small

23  amount.  The Court may find some award appropriate if the Trustee's objection is overruled.

24  However, the estate will be entitled to an award of fees from the Scotts if the Court sustains the

25  Trustee's objection to their claim.

26

27  / / /

28  / / /

1    III.    CONCLUSION

2         Factual and legal disputes abound and it is necessary to set a discovery and trial schedule

3    to reach a resolution of the Trustee's objection to the claim of Robert and Alyssa Scott.

4

5    DATED: September 10, 2007    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

6

7                                By: _____

8                                 Charles P. Maher
                             Attorneys for Andrea A. Wirum, Trustee

9

10

11    301007460.3

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

ER - 036

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re RAMIN YEGANEH,

               Debtor.

Case No. 05-30047 TEC
Chapter 7

## NOTICE OF COMPROMISE OF CLAIM

(Robert and Alyssa Scott)

TO CREDITORS, THE UNITED STATES TRUSTEE, AND OTHER INTERESTED PARTIES:

    **PLEASE TAKE NOTICE THAT** Andrea A. Wirum, Trustee in Bankruptcy of the estate of the above Debtor, has entered into a compromise with Robert and Alyssa Scott regarding their $500,000 general unsecured claim filed in the above case. Under the terms of the compromise, the Scotts will reduce their claim to (a) a general unsecured claim in the amount of $100,000 and (b) a subordinated claim of $125,000 under Section 726(a)(4) of the Bankruptcy Code. To the extent interest is paid on claims under Section 726(a)(5), the Scotts will be entitled to payment of interest as will other creditors.

    The Scotts filed a claim in the amount of $500,000 based on the Debtor's alleged violations of the Home Equity Sales Contract Act, the Foreclosure Consultant Law, and sought other damages for fraud, undue influence, and under other theories. The claims arose from the Debtor's purchase or alleged purchase of the equity in the Debtor's residence which was the real property commonly known as 1278 79th Avenue, Oakland, California. In 2003, the Scotts filed a complaint against the Debtor and others for damages and for rescission of the sale contract. Among the other defendants was Nicole Wilkins, who also has a claim on file against the Debtor.

    The Trustee filed an objection to the Scotts' claim. The Scotts filed documents in reply and a hearing was held on the objection. At the initial hearing, the Court set a trial schedule. As the trial approached, the Trustee and the Scotts negotiated a settlement, thereby obviating the need for a trial. Subject to Court approval, the Trustee and the Scotts have agreed that the Scotts will have an allowed general unsecured claim of $100,000 and a subordinated claim of $125,000 under Section 726(a)(4). Like other creditors, the Scotts will be entitled to interest if the case is a surplus case.

    In addition to the monetary terms of the settlement, the Scotts will release the Trustee, the Debtor, Debtor's parents and their trusts, and Nicole Wilkins of any and all claims and causes of action, (2) the Scotts will release any and all right, title, and interest in the subject property, (3) the Scotts will execute in the future any documents necessary in order to release any right, title, and interest in the property to the Trustee or any assignee of the Trustee, and (4) each party will bear its own costs and attorney's fees in connection with the Scotts' proof of claim.

Approval or rejection of a compromise is within the Court's discretion. In considering the approval of a proposed compromise, the Court must take into account the following factors:

1.  The probability of success in the litigation;

2.  The difficulty, if any, to be encountered in collection;

3.  The complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it;

4.  The paramount interest of creditors and proper deference to their reasonable views.

*In re A&C Properties*, 784 F. 2d 1377, 1381 (Ninth Cir. 1986).

<u>Probability of Success</u>

The Trustee believes that the probability of success is uncertain. The Trustee believes the Scotts will be unable to prove certain elements of their claim. The Trustee believes that the most serious question for the Court to consider is the element of damages the Scotts may have suffered. Based on appraisals of the property in question, the Trustee believes there is a strong likelihood that, if the Court found that the Debtor had violated the law, the Scotts would be able to demonstrate some damages, although not in the amount they sought in their proof of claim. The negotiated reduction brings certainty to the amount of damages and the amount and category of the Scotts' claim.

<u>Difficulty in collection</u>

This element of the *A&C Properties* test is not a factor in consideration of this compromise.

<u>Complexity, Expense, and Delay</u>

If the compromise is not approved, the Trustee will proceed to trial of the objection. The settlement negotiations began relatively late in the litigation and a large part of the expense has already been incurred. However, further preparation for trial will be necessary. The additional preparation and the trial itself will result in significant expense. The issues are not particularly complex and the Trustee does not believe a significant delay would result if the trial were to proceed, unless an appeal of the judgment were taken.

<u>Paramount Interest of Creditors</u>

The Trustee believes that approval of the compromise best serves the interest of creditors because it brings resolution to a disputed claim and avoids further litigation expense. The Trustee expects that creditors will voice their opinions about the compromise if they find it objectionable.

For the reasons stated above, the Trustee believes the compromise with the Scotts is in the best interest of the estate and should be approved.

/ / /
/ / /
/ / /

2

**PLEASE TAKE FURTHER NOTICE THAT** anyone who wishes to object to the proposed compromise must do so in conformity with Rule 9014-1 of the Bankruptcy Local Rules for the Northern District of California. Rule 9014-1 requires anyone who wishes to object to the proposed compromise to file a written objection with the Clerk, United States Bankruptcy Court, P.O. Box 7341, San Francisco, California 94120, and to serve a copy on counsel for the Trustee at the address noted below **no later than 20 days** from the date of this notice. Rule 9014-1 requires an objecting party file with its objection any legal memorandum and evidence (submitted by declaration) which it wants the Court to consider in support of its objection. If an objection is timely filed and served, counsel for the Trustee will obtain a hearing date and time and will provide the objecting party with at least 10 days notice of the hearing. If no objection is timely filed and served, the Trustee will request entry of an order authorizing the compromise without an actual hearing.

**PLEASE TAKE FURTHER NOTICE THAT** as of January 1, 2005, electronic filing became mandatory in the United States Bankruptcy Court for the Northern District of California. Those persons who may wish to object but are not qualified to file documents electronically with the Bankruptcy Court should check the Bankruptcy Court's website (www.canb.uscourts.gov) for guidance.

DATED: January 15, 2008    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: _Charles P. Maher_ _____
Charles P. Maher
Counsel for Andrea A. Wirum, Trustee

Charles P. Maher, State Bar No. 124748
LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone: (415) 356-4600
Facsimile: (415) 356-4610

301027801.1

# EXHIBIT 5

Barbara A. Smart, Esq., S.B. #147719
Smart Legal Services
Attorney at Law
22693 Hesperian Blvd., Suite 210
Hayward, CA 94541

Telephone: (510) 670-0101
Fax: (510) 783-1645
Attorney for Debtor(s).

*FILED*

02 JAN 10 AM 10: 51

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
OAKLAND, CA.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, DIVISION 4

In Re:

SCOTT, ROBERT AND ALYSSA

     Debtor(s).

)   Case No.: 01-46162 TG
)   Chapter 13
)
)
)
)
)
)
)
)

**FIRST AMENDED CHAPTER 13 PLAN**

-1-

U1 .ED STATES BANKRUPTCY COU...r
**NORTHERN DISTRICT OF CALIFORNIA**

In re:   **Scott, Robert and Alyssa**

Case No. 01-46162 TG
First Amended
**Chapter 13 Plan**

_____
                 Debtor(s).

1. The future earnings of the debtor(s) are submitted to the supervision and control of the trustee, and the debtor(s) will pay to the Trustee the sum of **$600.00** each month for __59__ months. Unless all allowed claims are paid in full, this Plan shall not be completed in fewer than 36 months from the first payment date.        Debtor(s) elect a voluntary wage order. _____.

2. From the payments received, the Trustee will make disbursements in accordance with the Distribution Guidelines as follows:
   (a) On allowed claims for expenses of administration required by 11 USC §507 (a)(1) in deferred payments.
   (b) On allowed secured claims, which shall be treated and valued as follows:

| Name | Value of Collateral | Estimated Mortgage/Lease Arrears | Minimum Monthly Payments (If specified) | Interest Rate (If Specified) |
|---|---|---|---|---|
| Ocwen Federal Bank FSB | $180,000.00 | $10,400.00 | | |
| City Bank Dealer Center (1998 Mazda MPV) | $13,500.00 | | | |

[The valuations shown above will be binding unless a timely objection to confirmation is filed. Secured claims will be allowed for the value of the collateral or the amount of the claim, whichever is less, and will be paid the monthly installments and the interest rates shown above. If the monthly payment is not specified, secured creditors will share pro rata. If an interest rate is not specified, 5/6% per month (10% per annum) will be paid. Secured creditors will retain their liens until their allowed secured claims have been paid. The remainder of the amount owing, if any, will be allowed as a general unsecured claim paid under the provisions of paragraph 2(d).]

   (c) On allowed priority unsecured claims in the order prescribed by 11 USC § 507.
   (d) On allowed general unsecured claims the debtor(s) estimate(s) the general unsecured claims will be paid **0%.**

3. The following executory contracts are rejected. The debtor(s) waive the protections of the automatic stay provided in 11 U.S.C. § 362 to enable the affected creditor to obtain possession and dispose of its collateral without further order of the court. Any allowed unsecured claim for damages resulting from rejection will be paid under paragraph 2(d).

4. The debtor(s) will pay directly the following fully secured creditors and lessors:

| Name | Monthly Payment | Name | Monthly Payment |
|---|---|---|---|
| Ocwen Federal Bank FSB | $1,091.00 | | |

5. The date this case was filed will be the effective date of the plan as well as the date when interest ceases accruing on unsecured claims against the estate.

6. The debtor(s) elect to have property of the estate revest in the debtor(s) upon plan confirmation. Once the property revests, the debtor(s) may sell or refinance real or personal property without further order of the court, upon approval of the Chapter 13 Trustee.

7. The debtor(s) further propose pursuant to 11 USC § 1322(b):

Dated: _1-8-02_          _____          _____
                                      (Debtor)Scott, Robert                         (Debtor)Scott, Alyssa

San Francisco & Oakland Divisions, Chapter 13 Plan
(October, 2001)

I/We **BARBARA A SMART** am/are legal counsel for the above named debtors(s) and hereby certify that the foregoing Chapter 13 Plan is a verbatim replica of this N.D. Cal., San Francisco and

Oakland Divisions, Model Chapter 13 Plan (October 2001), promulgated pursuant to B.L.R. 1007-1.

_Barbara A Smart_
Attorney for Debtor(s)

Case: 05-30047     Doc #: 388     Filed: 02/04/2008     Page 36 of 36

ER - 043

# EXHIBIT 6

1   Alan Steven Wolf, Bar No. 94665
    Daniel K. Fujimoto, Bar No. 158575
2   THE WOLF FIRM, A Law Corporation
    18 Corporate Plaza Drive
3   Newport Beach, California 92660-7901
    (949) 720-9200
4
    Attorneys for Movant
5   WELLS FARGO BANK MINNESOTA, NA AS TRUSTEE and OCWEN FEDERAL BANK
    as servicing
6

*FILED*

*02 OCT 17 PM 1:51*

*U.S. BANKRUPTCY
NORTHERN DISTRICT
OAKLAND, CA.*

7                  UNITED STATES BANKRUPTCY COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9
    In Re:                          )   CASE: 01-46162-TG
10                                  )
    ROBERT KIRK SCOTT and ALYSSA RENEE )  CHAPTER 13
11  SCOTT aka ALYSSA SUMNERS        )
                                    )   REF.: RS02  1505
12       Debtors.                   )
                                    )   NOTICE OF MOTION FOR
13                                  )   RELIEF FROM
                                    )   STAY
14                                  )
                                    )   DATE: 11/08/02
15                                  )   TIME: 11:00am
                                    )   CTRM: 201
16                                  )
                                    )   U.S. Bankruptcy Court
17                                  )   1300 Clay Street
                                    )   Oakland, CA 94604
18  _____)

19       TO Debtors, their counsel, and the Chapter 13 Trustee:

20       PLEASE TAKE NOTICE that on November 8, 2002 or as soon

21  thereafter as the matter can be heard before the Honorable LESLIE

22  TCHAIKOVSKY of the above-entitled court located at 1300 Clay

23  Street, Oakland, California, Movant will move this Court for an

24  order granting relief from the automatic stay relative to this

25  Creditor's interest in the real property commonly known as 1278

26  79th Avenue, Oakland, CA 94621 and more fully described in the

27  Motion herein.

28  ///

                                1

1    The Motion will be made on the grounds that there is cause

2    for relief from stay, including (1) lack of adequate protection;

3    (2) no equity in the subject property for the benefit of the

4    Debtor and the property is not necessary for an effective

5    reorganization; and (3) Debtor's failure to make the required

6    Trust Deed payments.

7    The Motion is based upon the pleadings, records and files in

8    this case including the instant Motion and the Declaration of

9    TERESA BRATCHER filed concurrently herewith.

10    NOTICE IS HEREBY GIVEN that failure to appear at the above

11    hearing will be deemed a waiver of ones' rights to oppose this

12    Motion resulting in an order granting relief from stay being

13    entered against you.

14    DATED:  OCT 1 4 2002          THE WOLF FIRM

15

16

17    ALAN STEVEN WOLF
     Attorneys for Movant
18    WELLS FARGO BANK MINNESOTA, NA AS
     TRUSTEE and OCWEN FEDERAL BANK as
19    servicing

20    bk/0456/9465/nom

21

22

23

24

25

26

27

28

                                    2

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT    FILED
Northern District of California    02 NOV 14 PM 3:54
Oakland Division
                                   01 4 6162

In re:  ROBERT KIRK SCOTT           U.S. BANKRUPTCY COURT 52  TG
        ALYSSA RENEE SCOTT          NORTHERN DIST. OF CA.
        Debtors                     OAKLAND, CA.
                                    Chapter:    13


### Debtors' Request for Voluntary Dismissal of Case

Comes now, ROBERT KIRK SCOTT AND ALYSSA RENEE SCOTT, by his/her
attorney, IN PRO PER, and show the court as follows:

1. Debtors filed for relief under Chapter 13 of the Bankruptcy Code on and an order for
   relief was entered.

2. This case has not been converted under 11 USC § 706 or 11 USC § 1112.

WHEREFORE, debtor requests for an order dismissing the abovestyled case without
prejudice.

Dated: 11-13-02

_____
Robert Kirk Scott, Debtor

_____
Alyssa Renee Scott, Debtor

# EXHIBIT 8

## EQUITY PURCHASE AGREEMENT

**NOTE:** For use by buyers of one-to-four residential units which are owner-occupied and in foreclosure, when the buyer does not intend to occupy the property. [Calif. Civil Code §1695]

DATE: __11/18/02__ , 20 _____ , at __Oakland__ , California

*Items left blank or unchecked are not applicable.*

**FACTS:**

1. This agreement is for the purchase of the following property, situated in the City of __Oakland__ , County of __Alameda__ , California
   Real estate: __1278 79th Ave, Oakland, CA 94621__
   Personal property: ☐ See attached inventory; __none__

2. This agreement is comprised of this two-page form and __1__ pages of addendum/attachments. **(Arbitration Agreement)**

**TERMS:** Buyer to pay the purchase price as follows:

3. Cash down payment through escrow in the amount of . . . . . . . . . . . . . . . . . . . $ __15,000__

4. Take title subject to an existing first trust deed note held by __New Century Mtg__ with an approximate unpaid amount of . . . . $ __125,000__
   payable $ __1000__ monthly until paid, including interest not exceeding __11__ %,
   ☒ ARM, plus monthly taxes/insurance impound payments of $ __n/a__
   4.1 This balance includes delinquent payments and foreclosure costs to be cured by buyer in the amount of $ __unknown__ , representing monthly payments due beginning with the month of _____ , 20 _____ .
   4.2 The impound account to be transferred without charge.

5. ☐ Take title subject to an existing second trust deed note
   held by _____ with an approximate unpaid amount of . . . . . . . . $ _____
   payable $ _____ monthly, including interest not exceeding _____ %, ☐ ARM, due _____ , 20 _____ .
   5.1 This balance includes delinquent payments and foreclosure costs to be cured by buyer in the amount of $ _____ , representing monthly payments due beginning with the month of _____ , 20 _____ .

6. At closing, loan balance differences disclosed by beneficiary statement(s) to be adjusted into the purchase price, but if the balance exceeds the amount stated, the difference to be adjusted into the cash down payment.

7. Buyer to obtain a ☐ first, or ☐ second, trust deed loan in the amount of . . . . . . . . $ _____
   payable approximately $ _____ monthly for a period of _____ years, interest on closing not to exceed _____ % per annum, ☐ ARM _____

8. Assume a bond or assessment lien of record in the amount of Support Judgment $ __20,000__

9. A NOTE for the balance of the purchase price, in the amount of . . . . . . . . . . $ _____
   to be executed by the Buyer in favor of Seller and secured by a trust deed on the property junior to any above referenced financing, payable $ _____ monthly, or more, beginning one month after closing, including interest at _____ % per annum from closing, due _____ , 20 _____ . [first tuesday Form 420]
   9.1 This note and trust deed will not contain provisions for due-on-sale, prepayment penalty or late charges.
   9.2 ☐ A Carryback Disclosure Statement is an attached addendum. [ft Form 300]

10. **TOTAL PURCHASE PRICE IS THE AMOUNT OF** . . . . . . . . . . . . . . . . . . . $ __160,000__

11. **ACCEPTANCE:** This offer shall be deemed revoked unless accepted in writing and returned by personal delivery ☒ on presentation, OR ☐ within _____ days after date hereof.

12. **CLOSING CONDITIONS:**
    12.1 This transaction to be escrowed with __any title company, if necessary__ . Parties to deliver signed instructions to escrow promptly on expiration of the cancellation period.
    12.2 Within __5__ days after acceptance, escrow to be handed all instruments needed to close escrow. Each Party to pay its customary escrow charges.
    12.3 The amount of any taxes, liens, bonds, assessments or other encumbrances on the property not referenced are, at Buyer's option, to remain of record and be deducted first from the cash down payment and then from any carryback note.
    12.4 Title to be subject to covenants, conditions, restrictions, reservations and easements of record. _____
    12.5 Title to be vested in Buyer or assignee free of liens and encumbrances other than those set forth above. Title shall be insured by __any__ Title Company under a ☐ Binder, or ☐ Joint protection, CLTA form policy of title insurance paid for by ☐ Seller ☒ Buyer.
    12.6 If an Owners' Association is involved, ☐ Buyer has received and approves, or ☐ Buyer to receive prior to close: Copies of Articles, Bylaws, CC&Rs, a statement of condition of assessments, collection and lien enforcement policy, operating budget, CPA's financial statement, insurance policy summary and any unenforceable age restrictions. No claims or special assessments are pending. Monthly assessment currently charged is $ _____
    12.7 Existing fire insurance policy or policies to be assigned to the Buyer.
    12.8 Taxes and insurance premiums shall be prorated to close of escrow, unless impounded by an existing lender or prepaid.
    12.9 Bill of Sale to be executed for any personal property.
    12.10 If Seller is unable to convey title as agreed, or if the improvements on the property are materially damaged prior to closing, Buyer may cancel this agreement and demand all instruments and funds be returned to the

**ER - 050**

— — — — — — — — — — — *PAGE TWO OF TWO — FORM 156* — — — — — — — — — —

12.11 Both Parties reserve their right to assign this agreement, and Seller agrees to cooperate with Buyer in effecting an Internal Revenue Code §1031 Exchange prior to close of escrow, on Buyer's written notice. [ft Form 172 or 173]

12.12 Other: _____

## 13. PROPERTY CONDITIONS:

13.1 ☐ Seller shall furnish a structural pest control report showing accessible areas of structures to be free of visible infestation caused by wood destroying insects, fungi, and/or dry rot. ☐ Seller shall pay for, OR ☐ price to be reduced by, the amount of any corrective work required. Corrective work limited to $_____.

13.2 ☐ Home Warranty Policy to be obtained by and charged to Seller.

13.3 Seller's Improvement (Transfer) Disclosure [ft Form 304]: ☐ is attached, or ☐ to be signed and handed to Buyer on acceptance for Buyer's approval within five days after receipt. Seller has ten days after notice of any significant undisclosed defective property conditions discovered prior to closing to cure the defects. On failure to cure, Buyer may cancel this agreement or tender the purchase price reduced by the cost of repair or replacement of the defects. [ft Form 183]

13.4 ☐ Buyer has inspected the property and its improvements, or ☐ Buyer to inspect per attached Property Inspection Agreement. [ft Form 270]

13.5 ☐ Seller's Natural Hazard Disclosure Statement [ft Form 314]: ☐ is attached, or ☐ to be handed to Buyer on acceptance for Buyer's approval within five days after receipt. On failure to approve, Buyer may cancel this agreement. [ft Form 183]

13.6 A smoke detector(s) exists in compliance with the law, or will be installed at Seller's cost prior to close of escrow.

13.7 Possession of the property and keys/access codes to be delivered on: ☐ close of escrow, ☐ the day prior to closing, or ☐ see attached Seller Holdover Occupancy Agreement. [ft Form 272]

13.8 Seller shall maintain the property in good condition until possession is delivered.

13.9 Fixtures and fittings attached to the property include but are not limited to, window shades, blinds, light fixtures, plumbing fixtures, curtain rods, wall-to-wall carpeting, draperies, hardware, TV antennas, air coolers and conditioners, trees, shrubs, mailboxes and other similar items.

13.10 Notice: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a database of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

I agree to the terms stated above.

Date: __11/18/02__, 20 ____
Buyer: __R. Rd__
Buyer: __R. Rad__
Address: __P.O.Box 322__
__San Mateo, CA  94401__
__(650) 520-6360__

I agree to the terms stated above.

Date: __11/18/02__, 20 ____
Seller: _____
Seller: __Robert K. Scott/Alyssa R. Scott__
Address: __1278 79th Ave__
__Oakland, CA  94621__

(To be filled out by Buyer)

CANCELLATION PERIOD: The Seller has the below noticed right to cancel this agreement until midnight of the fifth business day following the day the Seller signs this agreement, or until 8 a.m. on the day scheduled for a trustees foreclosure sale of the property, whichever occurs first.

### NOTICE REQUIRED BY CALIFORNIA LAW:

Until your right to cancel this contract has ended, __R. Rad__ (Buyer) or anyone working for __R. Rad__ (Buyer) CANNOT ask you to sign or have you sign any deed or any other document.

You may cancel this contract for the sale of your house without any penalty or obligation at any time before __12:00__, pm. on __November 26, 2002__, 20 ____

See attached notice of cancellation form for an explanation of this right.

— — — — — — — — — — **NOTICE OF CANCELLATION** — — — — — — — — — —

Seller signed the Equity Purchase Agreement on __11/18/02__, 20 ____.

You may cancel this contract for the sale of your house, without any penalty or obligation, at any time before __12:00__, pm. on __11/26/02__, 20 ____.

To cancel this transaction, personally deliver a signed and dated copy of this cancellation notice, or send a telegram to __R. Rad__ (Buyer) at __P.O.Box 322, San Mateo, CA  94401__ (Business Address)

NOT LATER THAN __1200__, p.m. on __11/26/02__, 20 ____.

I hereby cancel this transaction.
Date _____

Seller's Signature: _____
Seller's Signature: _____

# EXHIBIT 9

Recording Requested by:

and

**WHEN RECORDED MAIL TO:**
R. Rad
P.O.Box 322
San Mateo, CA   94401



2002570913 12/06/2002 04:06 PM
OFFICIAL RECORDS OF   RECORDING FEE: 7.00
ALAMEDA COUNTY        COUNTY TAX:   110.00
PATRICK O'CONNELL     CITY TAX:    1500.00

1  PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN:  041-4198-052

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 110 •—              $ 1500 —       City
X    Computed on the consideration or value of property conveyed; OR
___  Computed on the consideration or value less or encumbrances
     remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Robert K. Scott and Alyssa R. Scott, husband & wife as joint tenants
hereby GRANT(S) to
R. Rad, a single man

all the real property situated in the City of Oakland, Alameda County       , State of California, described as:

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of
Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda
County Records.
APN 041-4198-052
property commonly known as: 1278 79th Ave, Oakland, CA

Dated:  12/6/02

STATE OF CALIFORNIA
COUNTY OF   Alameda                    }ss
On  Dec 6 2002 before me  James Rudisill
personally appeared  Robert K Scott
                     Alyssa R Scott
personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature  James Rudisill

Robert K. Scott

Alyssa R. Scott

JAMES RUDISILL
COMM. #1219111
NOTARY PUBLIC-CALIFORNIA
COUNTY OF ALAMEDA
My Comm. Expires June 8, 2003

(This area for official notarial seal)

MAIL TAX
STATEMENTS TO:

# EXHIBIT 10

OFFICIAL CHECK

Washington Mutual Bank

245031744

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

WASHINGTON
MUTUAL

*********Dec 6, 2002 NINE THOUSAND DOLLARS AND 00 CENTS ***********

PAY
TO
THE
ORDER
OF

BRIAN McKINZIE

DRAWER: Washington Mutual Bank, FA

*William A. Longbrake*

AUTHORIZED SIGNATURE
REMITTER
R. RAD                                          1597 110

Issued By Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd, N.A., Los Angeles, CA

⑈054086⑈ ⑆122037171⑈ 680002450317744⑈

*Paid to Brian Mckinzie for Mr. Scott*

ER - 055

# EXHIBIT 11



Paid to Scotts landlord.

# EXHIBIT 12

December 7, 2002

LBH Investments/R.P. Real Estate
7901 Oakport Blvd., Suite #3975
Oakland, CA 94621
510-633-0143 (Office)
510-633-9009 (Fax)

Re: Receipt #001
Robert K. Scott
Alyssa R. Scott
1278 79th Avenue
Oakland, CA 94621

Final Amount Paid:          $  3,300.00 (remitted to: Ellie Sekona)

Balance Owed:               $      0.00


_____
Robert K. Scott

_____
Robert K. Scott for Alyssa Scott

# EXHIBIT 13

```
ALAMEDA COUNTY CLERK-RECORDER
     1106 MADISON STREET
     OAKLAND, CA 94607
       (510)272-6362
-------------------------------
ISSUED TO:YEGANEH,RAMIN
-------------------------------
RECEIPT #   391086
12/06/2002  04:06:36 PM
-------------------------------
DESCRIPTION              FEE
-------------------------------
16:06 2002570913
DEED        1 PG          7.00
COUNTY TRANSFER TAX     110.00
OAKLAND CITY TAX      1,500.00
RCDR CW/ L 2 PGS          0.00

                  ==============
Total Amount Due     $1,617.00

CHECK 1446            1,617.00
                  ==============
Total Payments:      $1,617.00


    PATRICK O'CONNELL
     CLERK RECORDER
    Deputy: JMEDELLI
```

ER - 061

# EXHIBIT 14

ER - 062



Paid for Mr. Scott's Child Support Judgment

ER - 063



# DEPARTMENT OF CHILD SUPPORT SERVICES
## ALAMEDA COUNTY
### California

**Maureen K. Lenahan, Director, Child Support Services**

---

DATE: December 30, 2002

ROBERT K. SCOTT
1278 79TH AVE
OAKLAND CA 94621

RE: ROBERT K. SCOTT

DCSS Case No.: **202065-A**

Dear  ROBERT K. SCOTT

Enclosed please find a Full Release of Judgment Lien.

Enclosed please find a Full Release of Judgment Lien.   This will remove the lien in your name if you buy, sell or refinance property listed at the Recorder's Office.

| |
|---|
| ALAMEDA COUNTY RECORDER |
| 1106 MADISON STREET |
| OAKLAND, CA  94607 |
| |
| |
| **Telephone #:** 510 272-6362 |

If you have any questions please contact the Recorder's Office regarding the fees, directions and how to release the lien via mail.

Very truly yours,

**Alameda County Department of
Child Support Services**

BY:  County DCSS Caseworker

Enclosure

3882 / jb

---

Business reply to the office marked with an "x"

<table>
<tr><td>[ ] REPLY TO THIS OFFICE<br>MAIN OFFICE<br>2901 Peralta Oaks Court<br>Oakland, CA 94605-5319<br>Telephone No.: (510) 639-7299<br>FAX No.: (510) 639-3523</td><td>PAYMENTS PAYABLE TO:<br>TREASURER OF ALAMEDA COUNTY<br>P.O. BOX 2072<br>OAKLAND, CALIFORNIA 94604</td><td>[X] REPLY TO THIS OFFICE<br>BRANCH OFFICE<br>393 - 13th Street<br>Oakland, CA 94612-2636<br>Telephone No.: (510) 891-5600<br>FAX No.: (510) 891-5610</td></tr>
</table>

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name & Address) | Telephone (510) 891-5649 | FOR RECORDER'S OR SECRETARY OF STATE'S USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name & Address)
**ALAMEDA COUNTY**
**DEPARTMENT OF CHILD SUPPORT SERVICES**
**393 - 13TH STREET**
**OAKLAND, CA 94612-2636**

Telephone **(510) 891-5649**

ATTORNEY PURSUANT TO W&J CODE SEC. 11475.1

COPY OF DOCUMENT RECORDED
DEC 3 0 2002 IN **02612322**
ON ____ AS NO. ____
HAS NOT BEEN COMPARED WITH ORIGINAL
**ALAMEDA COUNTY RECORDER**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS:   1225 FALLON STREET
MAILING ADDRESS:   SAME
CITY & ZIP CODE:   OAKLAND, CA 94612
BRANCH NAME:

PETITIONER/PLAINTIFF:  **COUNTY OF ALAMEDA, EX REL, CHRISTINE REED**

RESPONDENT/DEFENDANT:  **ROBERT K. SCOTT**

DCSS NO: 202065-A -3873-jb

CASE NUMBER:

**768101-7**

| **RELEASE OF JUDGMENT LIEN** | FOR COURT USE ONLY |
|---|---|
| [X] FULL   [ ] PARTIAL | |

1. RELEASE FROM JUDGMENT LIEN AS FOLLOWS:

 a. [X] **FULL RELEASE:**  This is a release from the Judgment Lien described herein of all interest in real property in   **ALAMEDA**

 b. [ ] **PARTIAL RELEASE:**  This is a release from the Judgment Lien described herein as to the specific property described as follows:

2. Full name and address of judgment creditor:
 **ALAMEDA COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES**
 **P.O. BOX 2072, OAKLAND, CALIFORNIA  94604**

3. Full name and address of assignee of record, if any:

4. Full name and address of judgment debtor being fully or partially released:
 **ROBERT KIRK SCOTT**
 **1278 79TH AVENUE, OAKLAND, CA 94621**

5. a. [X] Judgment entered on (DATE): **8/13/93**
   [ ] (1) in judgment book volume no:         (2) page no:

 b. [ ] Renewal entered on (DATE):
   [ ] (1) in judgment book volume no:         (2) page no:

6. An [ ] abstract of judgment [X] certified copy of the judgment has been recorded as follows
  (complete all information for each county where recorded)

| COUNTY | DATE OF RECORDING | BOOK NUMBER | PAGE NUMBER |
|---|---|---|---|
| ALAMEDA | 10/29/98 | 98381999 | |

7. [ ] A notice of judgment lien has been filed in the office of the Secretary of State as file number (specify):

Date:  **12/30/02**

Mr. J. Bruessard
LIEN OFFICER
(SIGNATURE OF JUDGMENT CREDITOR OR ASSIGNEE OF CREDITOR OR ATTORNEY)

CCP 697.370 (a) 697.400

State of California    )
                      )

County of Alameda  )
                      )

On this **12/30/02**, before me, _____ *Lisa A. Villarreal*_____, Notary Public, personally appeared **Mr. J. Bruessard** _____ personally known to me to be the person whose name is subscribed to the wthin instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

LISA A. VILLARREAL
Commission # 1358479
Notary Public - California
Alameda County
My Comm. Expires May 28, 2006

_____
**NOTARY PUBLIC**

ER - 066

# EXHIBIT 15

ER - 067



Paid to OCWEN FSB to Reinstate Scott's Mortgage.

ER - 068



Paid to Ocwen FSB to payoff Scotts' Mortgage.

ER - 069

# EXHIBIT 16

ER - 070

COUNTY OF ALAMEDA

OFFICE OF THE TREASURER AND TAX COLLECTOR
ADMINISTRATION BUILDING, 1221 OAK STREET, OAKLAND, CA  94612

CERTIFICATE OF REDEMPTION OF TAX DEFAULTED PROPERTY

```
ASSESSED TO:                        ASSESSOR'S PARCEL 41-4198-52
  SCOTT ROBERT K & ALYSSA R         YEAR-DEFAULT NO. 2001/02 - 591342
  1278 79TH AV                      TAX DEFAULT AMOUNT     $2,024.86
  OAKLAND CA            94621       SITUS:  1278 79TH AV

PAID BY:
  R. RAD                            DATE PAID      12/31/02

                                    RECEIPT NUMBER  244352

  P.O. BOX 322
  SAN MATEO       CA  94401
```

REDEMPTION AMOUNT:

| FISCAL YEAR | TAXES AND ASSESSMENTS | + | DELINQUENT PENALTY | + | COST | + | REDEMPTION PENALTIES | = | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 2001/02 | 1,459.04 | | 145.90 | | 10.00 | | 131.31 | | 1,746.25 |

```
TOTAL OF ABOVE                                      1,746.25

    INTEREST ON INSTALLMENT PAYMENTS                     .00
    PARTIES OF INTEREST NOTICE FEE                       .00
    RECORDING FEE                                        .00
    STATE REDEMPTION FEE                               15.00

TOTAL AMOUNT PAID TO REDEEM                         1,761.25
```

I HEREBY CERTIFY THAT I HAVE RECEIVED FROM THE PERSON NAMED ABOVE THE SUM OF
  $1,761.25  WHICH IS THE AMOUNT REQUIRED TO REDEEM THE ABOVE DESCRIBED
PROPERTY.


*Donald R. White*

DONALD R. WHITE
TREASURER-TAX COLLECTOR

ER - 071

# EXHIBIT 17

## 2002-2003
For Fiscal Year Beginning July 1, 2002 and Ending June 30, 2003

**ALAMEDA COUNTY**
**SECURED PROPERTY TAX STATEMENT**
Donald R. White, Treasurer and Tax Collector
1221 Oak Street
Oakland, California 94612-4285

| Parcel Number | Tracer Number | Tax-Rate Area | Special Handling |
|---|---|---|---|
| 41-4198-52 | 084639 | 17-032 | 000 |

Location of Property
1278 79TH AV
Assessed to on January 1, 2002
SCOTT ROBERT K & ALYSSA R

0972

SCOTT ROBERT K & ALYSSA R
1278 79TH AV
OAKLAND CA 94621-2608

### Tax-Rate Breakdown

| Taxing Agency | Tax Rate | Tax Amount |
|---|---|---|
| COUNTYWIDE TAX | 1.0000% | 853.89 |
| VOTER APPROVED DEBT SERVICE | | |
| CITY OF OAKLAND 1 | .1897% | 161.97 |
| SCHOOL UNIFIED | .0818% | 69.85 |
| SCHOOL COMM COLL | .0176% | 15.03 |
| EAST BAY REGIONAL PARK | .0065% | 5.55 |
| EBMUD SPEC DIST 1 | .0084% | 7.17 |
| TOTAL | 1.3040% | 1,113.46 |

### Important Messages

**URGENT REMINDER**
PRIOR YEAR TAXES FOR THIS PROPERTY ARE UNPAID. CALL 510-272-6820 FOR FURTHER INFORMATION.

IF YOUR TAXES ARE PAID THROUGH ESCROW SAVINGS & LOAN OR MORTGAGE COMPANY), IT IS YOUR RESPONSIBILITY TO FORWARD THIS BILL TO YOUR AGENT.

YOU MAY PAY YOUR PROPERTY TAXES USING VISA, MASTERCARD, DISCOVER, BRAVO OR PRIVATE ISSUE CREDIT CARDS OVER THE TELEPHONE 24 HOURS A DAY, SEVEN DAYS A WEEK OR ONLINE @ www.acgov.org. A CONVENIENCE FEE WILL BE ADDED UPON COMPLETION OF THE PAYMENT PROCESS.
Please See Reverse for More Tax Information

### Fixed Charges and/or Special Assessments

| Description | Phone | Amount |
|---|---|---|
| CITY DELINQ GRBAGE | (510)238-3287 | 422.42 |
| CSA PARAMEDIC | (510)618-2055 | 25.96 |
| CSA VECTOR CONTROL | (510)567-6800 | 7.28 |
| CITY EMERG MEDICAL | (510)238-7472 | 18.28 |
| CITY PARAMEDIC SRV | (510)238-7472 | 8.20 |
| CSA LEAD ABATEMENT | (510)567-8288 | 10.00 |
| SCHOOL MEASURE B | (510)238-8155 | 123.00 |
| FLOOD BENEFT 12 | (510)670-5518 | 16.00 |
| CITY LIBRARY SERV. | (510)238-7472 | 35.48 |
| EBMUD WETWEATHER | (510)287-1380 | 58.80 |
| EAST BAY TRAIL LLD | (800)273-5147 | 5.44 |
| CITY LANDSCP/LIGHT | (510)238-7472 | 102.64 |

| Total Fixed Charges and Special Assessments | | 825.40 |
|---|---|---|

### Tax Computation Worksheet

| Description | Full Valuation | x Tax Rate | = Tax Amount |
|---|---|---|---|
| LAND | 25,617 | | |
| IMPROVEMENTS | 59,772 | | |
| FIXTURES | | | |
| TOTAL REAL PROPERTY | 85,389 | | |
| PERSONAL PROPERTY | | | |
| GROSS ASSESSMENT & TAX | 85,389 | 1.3040% | 1,113.46 |
| HOMEOWNERS EXEMPTION | | | |
| OTHER EXEMPTION | | | |
| NET ASSESSMENT AND TAX | 85,389 | 1.3040% | 1,113.46 |
| | | | 1,113.46 |

| First Installment | Second Installment | Total Amount Due |
|---|---|---|
| $968.43 | $968.43 | $1,936.86 |

*paid 2002 property taxes for Scotts*
*paid $968.43 on Dec. 9, 2002*

ER - 073

# EXHIBIT 18

LAW OFFICES OF

# CARY S. KLETTER
ONE EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94111

TELEPHONE: (415) 732-3790
FACSIMILE: (415) 732-3791

CARY S. KLETTER, ESQ.*
YOSEF PERETZ, ESQ., OF COUNSEL
*Admitted in California and New York

Email: csk@kletterlaw.com
Email: yp@kletterlaw.com

## NOTICE OF CANCELLATION AND/OR RESCISSION
(California Civil Code §1691, §1695.4, §1695.5, 1695.14 and §2945.3)

### VIA CERTIFIED MAIL AND REGULAR FIRST CLASS MAIL

R. Rad aka Ramin Rad aka Ray Rad aka
Ramin Yeganeh aka R. Yeganeh
724 E 4th Avenue
P.O. Box 322
San Mateo, CA 94401

Ramin Yeganeh, ID 1070266
McGuire Correction Facility
300 Bradford Street
Redwood City, CA 94063

Allied Management Trust
2462 Taylor Avenue
Oakland, CA 94605

R.P. Real Estate, LLC
7901 Oakpor Street, Suite 3975
Oakland, CA 94621

LBH Investments
7901 Oakport Street, Suite 3975
Oakland, CA 94621

Nicole Wilkins
7901 Oakport Street, Suite 3975
Oakland, CA 94621

Brian McKenzie
7901 Oakport Street, Suite 3975
Oakland, CA 94621

PROPETY:          1278 79th Avenue, Oakland, California

EQUITY SELLERS:   Robert Scott and Alyssa Scott

EQUITY PUCHASER:  R. Rad

TITLE HOLDER:     Allied Management Trust

TO ALL ADDRESSEES AND ANY PERSON OR ENTITY IN POSSESSION OR HOLDING INTEREST TO THE PROPERTY

NOTICE IS HEREBY GIVEN that Robert Scoot and Alyssa Scott cancel the November 21, 2002 Agreement to Purchase Real Estate, the November 26, 2002 Agreement to Purchase Real Estate (the "Agreements") and any other conveyance instrument executed by Robert Scott and Alyssa Scott and/or R.P. Real Estate, LLC and/or LBH Investments and/or Nicole Wilkins and/or Brian McKenzie and/or R. Rad and/or Allied Management Trust purporting to convey the above-described property (the "Property") to you immediately upon service on you of this notice. You are required to deliver possession and reconvey title of the

Property to Robert Scott and Alyssa Scott free and clear of any and all encumbrances created subsequent to the execution of the Agreements immediately upon receiving this notice. This notice is given in accordance with California Civil Code §1695.4 and §1695.5 in that the Agreements failed to comply with the terms set forth in California Civil Code §1695 et seq., including but not limited to failing to provide Robert Scott and Alyssa Scott the name, business address, and the telephone number of the purchaser of the Property as required by Civil Code §1695.3(a), failing to provide Robert Scott and Alyssa Scott the total consideration to be given for the Property as part of the sale as required by Civil Code §1695.3(c), failing to provide Robert Scott and Alyssa Scott with a complete description of the terms of payments and any other consideration paid for the purchase of the Property as required by Civil Code §1695.3(d), failing to provide Robert Scott and Alyssa Scott with a separate written notice of the statutory right to cancel the Agreements within 5 business days as required by Civil Code §1695.5, and failing to provide Robert Scott and Alyssa Scott with written notice about the right to refrain from signing any instruments of conveyance until the cancellation period had elapsed according to Civil Code §1695.3(h). Additionally, you accepted from Robert Scott and Alyssa Scott the execution on an instrument of conveyance of the Property which was a residence in foreclosure, you recorded the deed of conveyance of the Property, paid Robert Scott and Alyssa Scott the contractual consideration, and made misleading statements regarding the sale, all prior to the expiration of the time provided for cancellation of a sale of residence and in violation of Civil Code §1695.6.

Notice of cancellation is further given by Robert Scott and Alyssa Scott to R.P. Real Estate, LLC and/or LBH Investments and/or Nicole Wilkins and/or Brian McKenzie of the Agreements and any other transaction in which you solicited and/or represented and/or perform any service with regard to the sale of the Property by Robert Scott and Alyssa Scott. This notice is given in accordance with California Civil Code §2954.3 in that the Agreements failed to comply with the terms set forth in California Civil Code §2945 et seq., including but not limited to failing to provide Robert Scott and Alyssa Scott the name, business address, and the telephone number of the foreclosure consultant of the Property as required by Civil Code §2945.3, failing to provide Robert Scott and Alyssa Scott the exact nature of their services and the total amount and terms of compensation to be given for consultation regarding the sale of the Property as part of the sale as required by Civil Code §2945.3(a), failing to provide Robert Scott and Alyssa Scott with a separate written notice of the statutory right to cancel the Agreement within 3 business days as required by Civil Code §2945.3(e), and failing to provide Robert Scott and Alyssa Scott with written notice about the right to refrain from signing any instruments of conveyance until the full completion of the services rendered according to Civil Code §1695.3(h). Additionally, you failed to comply with Civil Code §2945.11 requiring you to provide Robert Scott and Alyssa Scott with both a written proof and a statement under oath of a valid California Real Estate Sales License and that you are bonded by an admitted surety insurer in an amount equal to at least twice the fair market value of the Property.

Therefore, all addressees are hereby required to deliver possession and reconvey title of the Property to Robert Scott and Alyssa Scott free and clear of any and all encumbrances created subsequent to the execution of the Agreements immediately upon receiving this notice.

Notwithstanding above notice of cancellation, notice of rescission is hereby given by Robert Scott and Alyssa Scott to R.P. Real Estate, LLC and/or LBH Investments and/or Nicole Wilkins and/or Brian McKenzie and/or R.P. Real and/or Allied Management Trust in that

they rescind the Agreements and the transaction involving the sale of the Property to you (the "Transaction"). This notice is given in accordance with California Civil Code §1695.14 in which you initiated, entered into, negotiated, and consummated the Transaction by such terms that you took unconscionable advantage of Robert Scott and Alyssa Scott while the Property was in foreclosure, all in violation of Civil Code §1695.13.

Notice of rescission of the Agreements and Transaction is further given by Robert Scott and Alyssa Scott in accordance with Civil Code §1691 in that Robert Scott's and Alyssa Scott's consent for the execution of the Agreement was obtained through duress, menace, fraud, deception, undue influence, harassment and unfair dealing exercised by you with regard to the terms and condition of the sale of the Property.

Notice of rescission of the Agreements and Transaction is further given by Robert Scott and Alyssa Scott on the ground that the Transaction and transfer of title to the Property from Robert Scott and Alyssa Scott to R. Rad and from R. Rad to Allied Management Trust was executed unlawfully and in violation of a Preliminary Injunction dated March 21, 2000, and a modified Preliminary Injunction dated October 3, 2001, both issued by San Mateo County Superior Court, case number 410586.

Therefore and immediately upon service on you of this notice of rescission, you are required to deliver possession and reconvey title of the Property to Robert Scott and Alyssa Scott free and clear of any and all encumbrances created subsequent to the execution of the Agreements.

Date: August 19, 2003               By: _____
                                              Yosef Peretz
                                        Attorney for Robert and Alyssa Scott

## PROOF OF SERVICE

I, the undersigned, state that I am a citizen of the United States and employed in the City of San Bruno, that I am over the age of eighteen (18) years and not a party to the within cause; that I am an active member of the State Bar of California; that my business address is 305 San Bruno Avenue West, San Bruno, California; and that on the date set out below I deposited a true copy of the attached documents, listed below, on the parties to the action by one or more of the following methods:

[XX]  First Class Mail

[]  Fax via (415) 356-4610

– by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at San Bruno, California;

Documents Served: <u>DEBTOR'S OBJECTION TO TRUSTEE'S NOTICE OF COMPROMISE OF CLAIM OF ROBERT y ALYSSA SCOTT</u>

Party Served:  CHARLES P. MAHER, ESQ.
                Luce, Forward, Hamilton & Scripps, LLP
                Rincon Center II, 121 Spear St., Suite 200
                San Francisco, CA 94105

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed at San Bruno, California on February 4, 2008.

WILLIAM E. GILG,
Attorney at Law

1

<u>PROOF OF SERVICE</u>

I, the undersigned, state that I am a citizen of the United States and employed in

the City of San Bruno, that I am over the age of eighteen (18) years and not a party to the

within cause; that my business address is 305 San Bruno Avenue West, San Bruno,

California; and that on the date set out below I deposited a true copy of the attached

documents, listed below, on the parties to the action by one or more of the following

methods:

    [XX]  First Class Mail

    []  Fax via (415) 732-3791

    –   by placing a true copy thereof enclosed in a sealed envelope with postage

        thereon fully prepaid in the United States Mail at San Bruno, California;


Documents Served: <u>DEBTOR'S OBJECTION TO TRUSTEE'S NOTICE OF
COMPROMISE OF CLAIM OF ROBERT y ALYSSA SCOTT</u>


Party Served:  CARY KLETTER, ESQ.
             YOSEF PERETZ, ESQ.
             Kletter & Peretz
             One Embarcadero Center, Suite 1200
             San Francisco, CA 94111

    I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

    Executed at San Bruno, California on February 4, 2008.


1

## PROOF OF SERVICE

I, the undersigned, state that I am a citizen of the United States and employed in the City of San Bruno, that I am over the age of eighteen (18) years and not a party to the within cause; that my business address is 305 San Bruno Avenue West, San Bruno, California; and that on the date set out below I deposited a true copy of the attached documents, listed below, on the parties to the action by one or more of the following methods:

[XX]  First Class Mail

[]  Fax via (415) 495-3202

– by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at San Bruno, California;

Documents Served: <u>DEBTOR'S OBJECTION TO TRUSTEE'S NOTICE OF COMPROMISE OF CLAIM OF ROBERT y ALYSSA SCOTT</u>

Party Served:  RICHARD M. GRABSTEIN
Orme and Grabstein
685 Market St., Suite 370
San Francisco, CA 94105

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at San Bruno, California on February 4, 2008.

_____

l

ER - 080

# Document No. 2

1   Charles P. Maher, State Bar No. 124748
    LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2   Rincon Center II, 121 Spear Street, Suite 200
    San Francisco, California 94105-1582
3   Telephone No.: 415.356.4600
    Fax No.: 415.356.4610
4

5   Counsel for Andrea A. Wirum
    Trustee in Bankruptcy
6

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12
                        Debtor.
13                                          Date:   February 29, 2008
                                            Time:   9:30 a.m.
14                                          Place:  235 Pine Street, 23rd Floor
                                                    San Francisco
15                                          Court:  Hon. Thomas E. Carlson
16

17              **DECLARATION OF ANDREA A. WIRUM**

18      I, Andrea A. Wirum, declare as follows:

19      1.      Upon the death of Charles E. Sims, the original Trustee in the above case, I was

20  appointed Trustee in Bankruptcy of the estate of the above Debtor and I continue to serve in that

21  capacity. I am fully familiar with the economic condition of the estate.

22      2.      Based on my review of the Debtor's schedules of assets, I am informed and believe

23  that the Debtor disclosed interests in seven parcels of real property in San Mateo County and San

24  Francisco County when he filed his Chapter 13 petition.

25      3.      From my review of files in this case, I am informed and believe that, between us,

26  my predecessor Mr. Sims and I have sold five of these parcels. Two parcels remain. One is the

27  Debtor's residence which is commonly known as 724 E. 4th Avenue, San Mateo, California. The

28  other is an unimproved parcel in Belmont, California.

ER - 081

4.      I am informed and believe that both the Debtor's residence and the unimproved lot are unencumbered by voluntary debt.  Based on an estimate of value made before the recent downturn in the real estate market, I believe that together these two assets have a value of less than $1,000,000 for the estate.

5.      At this time, I have $103,589.67 in cash on hand.

6.      Based on the proofs of claim on file, an order approving a compromise liquidating and classifying the claims of certain judgment creditors and their attorneys, and on interim distributions in the case, I am informed and believe that, exclusive of administrative expenses, there are approximately $3,780,000 in unpaid claims against the estate.  The claims (in rounded numbers) are as follows:

(a)     $1,904,000 claim of DLA Piper USA (after interim distribution of 26 percent)

(b)     $500,000 claim of Robert and Alyssa Scott (subject to pending compromise)

(c)     $250,000 claim of Phyllis Shoop (subject to objection and likely compromise)

(d)     $74,000 claim of Nicole Wilkins (subject to objection)

(e)     $1,000 claim of John Blackman (may be withdrawn)

(f)     $1,051,000 subordinated claim of DLA Piper USA

7.      Thus far I have paid approximately $480,000 in secured claims through sales of real property and approximately $669,000 in undisputed general unsecured claims.

8.      Based on the cash on hand, the two remaining assets, and the aggregate amount of claims, the estate is insolvent at the general unsecured claim level.

9.      In addition to prepetition claims, there are unpaid administrative expenses.  Because of numerous ongoing actions involving the Debtor, his parents, and appeals commenced by the Debtor or his parents, I cannot accurately estimate the ultimate amount of administrative expenses at this time.

10.     In addition to the two parcels of real property identified above and the cash on hand, I have recovered through judgment five parcels of real property in Alameda, California.  The Court has determined that the Debtor fraudulently conveyed those parcels to a trust and the Debtor's father.  I also have claims for recovery of other parcels which I contend the Debtor

1    fraudulently conveyed to other insiders.   Summary judgment motions are currently under

2    submission in three adversary proceedings brought for recovery of those parcels.

3        11.    Based on the anticipated recovery of additional real property from insiders to

4    whom the Debtor transferred assets, I anticipate that general unsecured claims will be paid in full

5    and that subordinated claims under Section 726(a)(4) will receive a pro rata distribution only.

6        12.    I authorized my counsel to negotiate a compromise with Robert and Alyssa Scott

7    regarding their $500,000 claim in the above case.   The negotiations produced a $275,000

8    reduction in the claim and bifurcated it into two classifications: $100,000 general unsecured claim

9    and $125,000 claim subordinated under Section 726(a)(4).

10       13.    Because it is my understanding that property recovered from a fraudulent transferee

11   must be returned to the fraudulent transferee and does not remain in the estate as a surplus for the

12   fraudulent transferor, I believe there is no possibility that the case will be a surplus case.

13       14.    For the reasons stated in the memorandum filed with this declaration, I have

14   concluded that the proposed compromise with Robert and Alyssa Scott is in the best interest of

15   this bankruptcy estate.

16       I declare under penalty of perjury that the above statements are true and that if called as a

17   witness I could and would testify to their truthfulness.  This declaration is executed on the 22nd

18   day of February 2008 in Lafayette, California.

19

20

21                         /s/Andrea A. Wirum
                           Andrea A. Wirum
22

23   301030640.1

24

25

26

27

28

# Document No. 3

1   Charles P. Maher, State Bar No. 124748
    LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2   Rincon Center II, 121 Spear Street, Suite 200
    San Francisco, California 94105-1582
3   Telephone No.: 415.356.4600
    Fax No.: 415.356.4610
4

5   Counsel for Andrea A. Wirum
    Trustee in Bankruptcy
6

7

8                UNITED STATES BANKRUPTCY COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11   In re RAMIN YEGANEH,            Case No. 05-30047 TEC
                           Chapter 7
12

13            Debtor.            Date:  February 29, 2008
                           Time:  9:30 a.m.
14                            Place: 235 Pine Street, 23rd Floor
                                   San Francisco
15                            Court: Hon. Thomas E. Carlson

16

17       __**DECLARATION OF JEFFREY L. FILLERUP IN SUPPORT OF COMPROMISE**__

18        I, Jeffrey L. Fillerup, declare, as follows:

19        1.    I am a litigation partner in the law firm of Luce, Forward, Hamilton & Scripps

20 LLP. We are the attorneys for the Trustee, Andrea A. Wirum (the "Trustee"), in this bankruptcy

21 proceeding. I have had primary responsibility for defending the proof of claim filed by the

22 claimants Robert Scott and Alyssa Scott, and I was primarily responsible for conducting

23 discovery in connection with the claim and negotiating the compromise at issue. If this claim had

24 been tried, I would have been the Trustee's trial counsel. Based on the foregoing, I have

25 personal knowledge of the facts set forth in this declaration.

26        2.    Robert Scott and Alyssa Scott (the "Scotts" or "Claimants") filed a proof of claim

27 on April 28, 2005 in the amount of $500,000 (the "Scott Claim"). The Scott Claim was based on

28 a pre-petition state court suit the Claimants had filed against the Debtor, which was captioned

1  Robert Scott  and Alyssa Scott  v. R. Rad, et al., Alameda County Superior Court, Case No.

2  RG0312993.    The Claimants' proof of claim incorporates the claims  in the state court case,

3  and the proof of claim attached the state court complaint as an exhibit.   The Scott Claim alleged

4  claims against the Debtor based on violations of the California   Home Equity Sales Act,

5  Foreclosure Consultants law, fraud, and undue influence   against the debtor arising out of the

6  debtor's alleged pre-petition purchase of  the Claimants' residence (the "property").

7      3.      The Trustee  objected to the proof of claim in January, 2007.   The Scotts timely

8  filed a response to the Trustee's objection.   The court then set a  status conference on the claim

9  objection  for September 24, 2007.   At the status conference, the court set a January 2, 2007 trial

10  date, and a December 3, 2007 discovery completion deadline.

11      4.      I conducted written discovery on behalf of the Trustee prior to the  discovery

12  completion deadline,  including document requests and interrogatories.   I set the depositions of

13  the Claimants and the deposition of the Claimants' expert witness, but those depositions were

14  continued  because of on-going settlement discussions.    I also had a series of telephone calls with

15  the Trustee's expert witness,  real estate appraiser Allison Teeman, regarding the market value of

16  the property in 2002.      During the course of discovery, I had numerous telephone conversations

17  and meetings with the Scott's counsel, Joseph Peretz, regarding the claims  in the case, the

18  Trustee's defenses, and settlement.

19      5.      After the discovery completion date,  as a result of the settlement discussions I had

20  had with the Scott's counsel,   the Trustee and the Claimants agreed to compromise the  Scott

21  Claim. Mr. Peretz and I put the settlement on the record on January 2, 2008.   According to the

22  settlement,  the  Claimants will have  an allowed unsecured claim of  $100,000 under Section

23  726(a)(2);   they will have   a subordinated claim of $125,000 under Section 726(a)(4); and the

24  Claimants may seek to recover interest under Section 726(a)(5).     The  Claimants agreed to

25  release the Trustee, the Debtor,  the Debtor's parents/trusts, and Nicole Wilkins  of any and all

26  claims and causes of action;     the Claimants agreed to  release and relinquish to the Trustee any

27  right, title and interest in the subject property, if any;  and  the Claimants agreed to  execute  any

28  documents necessary  to release any right, title and interest in the property to the Trustee or any

1  assignee of the Trustee. The parties agreed to bear their own costs and attorney's fees in

2  connection with the Scott Claim. The Claimants also agreed and acknowledged that the Trustee

3  owns all right, title and interest in the subject property, which is located at 1278 79th Avenue,

4  Oakland, California

5      6.    I recommended this settlement to the Trustee. My recommendation took into

6  account a number of factors, including the factors set forth in *In re A&C Properties*, 784 F. 2d.

7  1377, 1381 (9th Cir. 1986). Among the factors in *In re A&C Properties* that I believed were most

8  significant factors to this compromise were the probability of success in the litigation; the

9  expense and complexity of the litigation; and the interests of creditors.

10     7.    With regard to the probability of success, I believed that there was a reasonable

11 likelihood that the Claimants would prevail on their statutory violation claims, although I felt that

12 the damages claimed by the Claimants were excessive and that the Claimants would not recover

13 the full amount of the damages they were seeking. The Trustee had a strong argument that the

14 Claimants' damages were limited, and that they would not be in the $500,000 range sought in the

15 Scott Claim. Based on the discussions I had had with our expert witness, it was very unlikely

16 that the Trustee could prove no damages if the Claimants were able to prove the statutory

17 violations. Also, if the Claimants were able to prove statutory violations, then it is probable that

18 the court would award the Claimants some amount of attorney's fees under the attorney's fees

19 provisions in the applicable statutes.

20     8.    At the time we reached the settlement, I had not taken the Claimants' depositions,

21 but I had received the Claimants responses to the Trustee's interrogatories and I had discussed the

22 Claimants' expected testimony with Mr. Peretz. I anticipated that the Claimants' testimony

23 would reflect their sworn discovery responses and the account provided by their counsel. On the

24 other hand, the Debtor had a different version of events surrounding his discussions with the

25 Claimants and his eventual agreement to purchase their residence. There is no question that the

26 evidence of the events leading up to the agreement would be disputed, and the key facts about

27 when meetings took place, what the Debtor said in those meetings, and when documents were

28 actually signed would be disputed.

9.    The Trustee's September 10, 2007 response (the "Response") to the Scott Claim indicated that the Scotts had presented insufficient evidence to support claims against the Debtor under the California Foreclosure Consultant Law or the Unfair Competition Law.  I was confident that  the Scotts would have difficulty satisfying their burden or proving that  the Debtor had violated the Unfair Competition Law because the  Scotts did not have standing to assert such a claim under California Business and Professions Code Section 17204.    Even if they did have standing to assert a   claim,   Section 17200 does not allow for the recovery of damages and restitutionary and injunctive relief would be of limited  value to the Claimants in this case.  Also, there  is no independent right to recover attorney's fees under Section 17200.      However, as indicated above, I  was not as confident, because of the anticipated conflicting testimony, that the Trustee would prevail on the Claimants' claims for violation of the California Foreclosure Consultant Law.    While there is a legal argument that the statute would not apply to the activities of the Debtor in this situation,  I could not advise the Trustee that there was a high probability we would prevail on that legal argument.

10.    As to the Scotts'  common law fraud claim,  the Scotts' burden of proving each of the prima facie elements of fraud was subject to the "clear and convincing" standard.    While the Scotts' proof of claim did not set forth evidence that would satisfy this  standard or proof,  the ultimate decision on liability for fraud would be made at trial based on the disputed testimony of the Claimants and the Debtor.   I viewed this claim as depending upon the credibility of the Debtor and the Claimants.  Based on the experience I have had in deposing the Debtor and my experience in reviewing  the transcripts of other sworn testimony given by the Debtor, I had  doubts about the Debtor's credibility.

11.    The  Scotts' other statutory claim was based on  alleged violations of the Home Equity Sales Contract Act (Section 1695 et seq. of the California Civil Code).  The Home Equity Sales Contract Act ("HESA") imposes restrictions on persons seeking to purchase equity in homes that are in foreclosure and provides for penalties for violations of the restrictions.  The Scotts alleged eight violations of HESA.  In the Trustee's Response, she asserted that the Scotts' first two allegations were false.  Those allegations were:  (a)  accepting from the Scotts and executing the

1  grant deed before the statutory cancellation period had elapsed, as required by Civil Code §1695.6

2  and (b) recording the grant deed before the statutory cancellation period had elapsed, as required

3  by Civil Code §1695.6.  The Trustee's position in September 2007 that these allegations were

4  false was based on information provided by the Debtor in which he asserted that (a) the Equity

5  Purchase Agreement had in fact been executed on November 18, 2002, (b) the statutory

6  cancellation period expired on November 25, 2002, and (c) the grant deed had been executed on

7  December 6, 2002.  The Scotts have asserted  that the Equity Purchase Agreement was not

8  executed on November 18, 2002, but at a later date.  In a declaration recently filed by Nicole

9  Wilkins in opposition to the Trustee's objection to her claim, Ms. Wilkins has testified that the

10  Equity Purchase Agreement was actually executed on December 6, 2002.  There is a serious

11  factual dispute on these two allegations and much uncertainty over whose testimony the court

12  would believe.  The Trustee also characterized as false the Scotts' allegation that no written notice

13  had been given to the Scotts informing them of their right to refrain from signing any instruments

14  of conveyance until the cancellation period had elapsed, as required by Section 1695.3(h) of the

15  Civil Code.  There are other disputed factual issues relating the Scotts' HESA claims.  First,  there

16  is disputed evidence  about whether proper notice to the Scotts was given of their right to refrain

17  from signing conveyance documents before the cancellation period expired.  Second, there is

18  disputed evidence about  whether the Debtor provided the Scotts with the "name, business

19  address, and telephone number of the purchaser" as required by Section 1695(a) of the Civil Code.

20  The Trustee cannot deny that the Debtor's used an alias "R. Rad" instead of providing the Scotts

21  with his true name.   Given this conflicting testimony about  when the agreement was signed, the

22  timely provision of the other information is also called into question.    The existence of these

23  disputed   factual issues and  my doubts about whether the court would  find the Debtor's

24  testimony credible,  were factors in assessing whether the Trustee should settle or  try this claim

25  objection.

26      12.    One of the  Claimants' damages claims  was based on a valuation of the property.

27  The Scotts had claimed the property's value was in the  $240,000 to  $300,000 range at the time

28  of the transaction with the Debtor in 2002.  The Trustee's appraiser had valued the property at

1    about $190,000.    I anticipated that the court would consider conflicting testimony on the value

2    of the property and could reach a valuation in the low-$200,000's.        Given the anticipated

3    valuation of the property, the Claimants could persuade the court that their damages based on the

4    difference in what the Debtor paid for the property and the market value at the time was at least in

5    $30,000 to $40,000 range.  The Scotts have claimed that they lost appreciation in the five years

6    since the sale closed.  If a seller seeks damages for lost appreciation, the seller must include proof

7    that it would have had a colorable chance of holding onto the property to realize the appreciation.

8    It may have been difficult for the Scotts to show that they could have held onto the property to

9    realize the appreciation.  This issue would have also involved conflicting testimony.        It would

10   have been necessary for the Trustee to put on expert testimony on this issue, which would have

11   required the additional expense of a second expert witness.  The outcome of this factual dispute

12   would have affected the amount of the Claimants' damages claim.

13       13.      The Scotts had made a claim for treble damages and the Scott's counsel indicated

14   that there was a high probability that the Scotts would recover treble damages.  I did not agree

15   with the Scotts' assessment, but the availability of treble damages in HESA was a factor the

16   Trustee had to consider.      Section 1695.7 limits treble damages to (a) transactions found to be

17   unconscionable under Section 1695.13 and (b) transactions that include a violation of

18   1695.6(b)(3).      Section 1695.13 prohibits transactions if "by the terms of such transaction [the

19   equity purchaser] takes unconscionable advantage of the property owner in foreclosure." Section

20   1695(b)(3) prohibits a subsequent transfer or encumbrance of any interest in the property to any

21   third party.    It is possible that the court could determine that the Equity Purchase Agreement was

22   executed on December 6, 2002, and back-dated to November 18, 2002, that the Debtor rushed the

23   Scotts through execution of the agreement and grant deed, and that the totality of the

24   circumstances created an unconscionable advantage in favor of the Debtor.  If the court made this

25   determination, treble damages could be awarded.      The court could also determine that the

26   consideration given by the Debtor was unconscionably low.    In either instance, treble damages

27   could potentially be available under Section 1695.13.  After the sale by the Scotts to "R. Rad"

28   closed, the Debtor transferred the property to Allied Management Trust.  This subsequent transfer

1    violated Section 1695.6(b)(3).   The Trustee has argued that her subsequent recovery of the

2    property as a fraudulent conveyance nullified the subsequent transfer.  I do not know whether the

3    court would agree.

4        14.    Attorney's fees are also available under HESA.   Based on  Section 1695.14(d), if

5    the Scotts prevailed on their HESA violation claim,  an award of attorney fees would be possible.

6    The Scotts claimed over $100,000 in attorney's fees.

7        15.    The Debtor's objection to the compromise fails to take into account the question of

8    his own credibility.   This failure is significant because it is characteristic of the Debtor.  I have

9    personally seen this in taking the Debtor's deposition when he has refused to acknowledge in his

10   own lack of credibility based on prior inconsistent statements he has made and prior inconsistent

11   testimony he has given.      The Trustee cannot and should not evaluate this case based upon the

12   Debtor's evaluation of his own credibility.

13       16.    If the Trustee did not compromise this claim, the Trustee would incur significant

14   additional attorneys fees and costs in defending the claims.   The depositions of the Claimants and

15   the expert witnesses would be taken.   The deposition of the Debtor would be taken.   Significant

16   costs would be incurred in paying the Trustee's appraisal and financial experts.      The Trustee

17   would incur significant costs in other pre-trial activities, such as the preparation of a  pre-trial

18   statement, trial brief, post-trial briefing,  and trial exhibits.  I expect that if the case were tried, it

19   would take 3 or 4 trial days.

20       I declare under penalty of perjury under the laws of the United States that the above

21   statements are true and that if called as a witness I could and would testify to their truthfulness.

22   This declaration was executed on the 22 day of February 2008 in San Francisco, California.

23

24                                    /s/Jeffrey L. Fillerup, Esq., CSBN 120543
                                      Jeffrey L. Fillerup
25
     301031395.1
26

27

28

ER - 090

.

# Document No. 4

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

In Re:                              ) Case No. 05-30047 TEC
                                    ) Chapter 7
RAMIN YEGANEH,                      )
                                    )
                    Debtor.         ) MOTION
                                    )
                                    ) Friday, February 29, 2008
_____) San Francisco, California


Appearances:

For the Debtor:          William E. Gilg, Esq.
                         305 San Bruno Avenue West
                         San Bruno, California  94066
                         (640) 871-8647, telephone; 873-3168, fax

For Andrea A. Wirum,     Charles Maher, Esq.
Trustee in Bankruptcy:   Luce, Forward, Hamilton & Scripps, LLP
                         Rincon Center II
                         121 Spear Street, Suite 200
                         San Francisco, California  94105-1582
                         (415) 356-4610, telephone


Digital Court            United States Bankruptcy Court
Reporter:                Clerk of the Court
                         Jane L. Galvani
                         235 Pine Street, 23rd Floor (94104)
                         Post Office Box 7341
                         San Francisco, California  94120-7341
                         (415) 268-2366


Certified Electronic     Palmer Reporting Services
Transcriber:             1948 Diamond Oak Way
                         Manteca, California  95336-9124


            Proceedings recorded by digital recording;
    transcript produced by federally-approved transcription service.

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124    (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 1 of 15

ER - 091

*Motion*                                                                                2

1   Friday, February 29, 2008                                9:50 o'clock a.m.

2                         P R O C E E D I N G S

3          THE CLERK:  Line Number 4, in the matter of Ramin

4   Yeganeh.

5          MR. MAHER:  Good morning, Your Honor.  Charles Maher

6   of Luce Forward on behalf of the Trustee.

7          MR. GILG:  Good morning, Your Honor.  Bill Gilg,

8   special attorney for the debtor Ramin Yeganeh.

9          THE COURT:  Okay.  I've read the motion, and I've read

10  the opposition.  Is there anything you want to add?

11         MR. MAHER:  I don't think, Your Hon- — so, Your Honor.

12         MR. GILG:  I would — I'd just like to say, Your Honor,

13  basically everything is in the brief, but I'd just like to

14  emphasize that the appeal of the DL Piper Gray Cary claim is in

15  the Ninth Circuit now.  If that's reversed or modified that

16  could be a surplus estate, and my client would have standing to

17  object.

18         THE COURT:  The appeal of the settlement.

19         MR. GILG:  The compromise.

20         THE COURT:  Yeah.

21         MR. GILG:  The compromise, yes.  And if that's

22  reversed or modified my client would certainly have standing,

23  Your Honor.  Also, he waived his discharge, so he — there's a

24  possibility of a —

25         THE COURT:  Well, I don't have any question about the

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 2 of 15

ER - 092

*Motion*                                                                              3

1    standing of the debtor.

2              MR. GILG:  Okay.

3              THE COURT:  I have no — I don't think that the Trustee

4    has established that there's no standing.

5              MR. GILG:  Okay.  If I could just comment on the

6    merits of the claim just — just briefly?

7              THE COURT:  Sure.

8              MR. GILG:  There's a factual dispute as to when this

9    contract was entered into.  The Scotts say it was entered into

10   December 6, '02 and backdated, and therefore it violated various

11   provisions of the Home Equity Sales Act.

12             Well, if — if that — you know, my client disputes

13   that, of course.  But if that's true then the Home Equity Sales

14   Act would not apply, because at that time the Scotts had moved

15   out into rental property.

16             And it was not owner-occupied as their principal

17   business, which is required by the Home Equity Sales Act.  So

18   the Home Equity Sales Act would not even apply in that — that

19   instance.

20             If — if the trier of fact found that the contract that

21   was entered into on November 18th, '02, as my client — as my

22   client's position is, then there's only two — two provisions

23   that are applicable.  And one is that he used a false name,

24   which is incorrect.  He used R. Rad, which is — that's the name

25   he was given when he was — became a citizen.

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 3 of 15

ER - 093

*Motion*                                                              4

1          And that was — I mean, the Trustee has — the Trustee —

2    I think it's Exhibit 28 in his summary judgment motions on

3    adversary proceedings admits that.  He attached that as an

4    exhibit.

5          The second one is unconscionability.  And the Trustee

6    admits that his — his appraisals were 90 — 190,000.  And my

7    client paid 164,000.  I mean that's not — I don't see how the

8    trier of fact could find that unconscionable.

9          And, therefore, you know, my client's position is that

10   the — the compromise is not fair and equitable because he paid

11   around 164,000.  And the Trustee wants to give the Scotts

12   another 225,000.  So that means that they're getting 389,000 for

13   a property worth 190,000.  And I'll submit it on that, Your

14   Honor.

15         THE COURT:  What about this question of whether the

16   Home Equity Sales Act applies?

17         MR. MAHER:  Well, I think it — it does apply, Your

18   Honor.  This is an — this —

19         THE COURT:  Okay.

20         MR. MAHER:  I didn't know until a document filed a day

21   or two ago that this was even an — an issue, when the — when the

22   Scotts moved out.

23         I don't recall ever discussing it with the debtor in

24   the numerous conversations I've had with them.  So that was a

25   little bit of a surprise to me.

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124  (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 4 of 15

ER - 094

*Motion*                                                        5

1         However, it was the principal residence.  It was — you

2    know, I don't know how they would have moved out without a first

3    and last — moved in, rather, to an apartment without a first and

4    last month's rent, which Mr. Yeganeh provided on December 6th.

5         I think it's a stretch to say because they were moving

6    out that it no longer was their principal residence.  I think

7    the statute is designed to protect people in the Scotts'

8    position.  And I think it Court would find that it does apply.

9    It was their only real property.

10        It's not like they had moved out two or three months

11   before.  They were clearly living there on November 18th.  I

12   mean how — how far before December 6th when the grant deed was

13   recorded does it — you know, is it — is it not their principal

14   residence?  I don't really have an answer to that.

15        MR. GILG:  Well, I think it would be determined on a

16   definition of principal residence if they — they — obviously

17   they had — they had a place to move, because my client paid the —

18   the $3300 for the — for their I think first month's rent, or

19   whatever.  Obviously they had a place to move.  It couldn't —

20   it could not have been the principal place of residence because

21   they were moving, or they — they had moved, or there were in the

22   process of it.

23        THE COURT:  Okay.  Let me — everybody stay seated.  I

24   don't have my — does anybody have a copy of the Civil Code here?

25        MR. GILG:  I do, Your Honor.

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 5 of 15

ER - 095

*Motion*                                                               6

1            MR. MAHER:  I have the —

2            THE COURT:  Okay.  Because, you know, I've read these

3    things.  I've actually read it quite a bit.

4            MR. GILG:  I — I don't have any caselaw on what a

5    principal place of residence is, Your Honor.  I could research

6    that if the Court —

7            THE COURT:  No, I just want to see what the —

8            MR. GILG:  It's — it's 1695.1(b).

9            THE COURT:  Yes.  I see it right here.

10       (Pause in proceedings while the Court peruses a document.)

11           THE COURT:  I think what I want to do with this, I

12   want to put this over for a short period time to let the Trustee

13   look into this.  This is the one — this is one question that

14   could impact the value of this claim quite a bit.  I want you to

15   just look into it.

16           MR. MAHER:  That would be fine, Your Honor.

17           THE COURT:  Put it over for, you know, seven days or

18   something to let you investigate this and see what the Scotts

19   say.

20           MR. MAHER:  Let's — let's make sure that I understand

21   what we're saying here.  What the debtor is admitting is that he

22   backdated a contract.

23           MR. GILG:  No, the debtor is not admitting that, Your

24   Honor.

25           MR. MAHER:  Well, that's what this argument is

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 6 of 15

ER - 096

*Motion*                                                                    7

1  predicated on, —

2           MR. GILG:  And the —

3           MR. MAHER:  — is that they had — is that they had

4  moved out by December 6.  And they signed the contract on

5  December 6.  And the debtor backdated it to November 18th.

6           There's no dispute about what the date on the

7  agreement is.  It's November 18.  And the debtor has maintained,

8  until two days ago, that it was signed on November 18, when — I

9  don't think there's any dispute they, the Scotts, did have this

10 property as their principal residence.

11          So what the debtor is trying to do is take advantage

12 of one of two lies.  And it's — it — I guess what we need to

13 find out is:  When was the agreement signed, December 6th?

14          THE COURT:  When did the — when are you asserting that

15 the — that it's the Scotts, right?

16          MR. MAHER:  Yes, Your Honor.

17          THE COURT:  When are you asserting that the Scotts

18 moved out?

19          MR. GILG:  Well, as I understand it, Your Honor, they

20 — the Scotts, at the time of — on December 6th they handed over

21 the keys to my client.  And they had — they had obtained rental

22 property.  And they had — they had moved out, you know, as I

23 understand it, prior to that date or on — on — before the —

24 before the deed was signed.

25          And we're not — we're not saying that this — the

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047     Doc #: 415     Filed: 04/07/2008     Page 7 of 15

ER - 097

*Motion*                                                                 8

1    contract was signed on December 6th.  I'm just turning the

2    tables on them.  If they say it was signed on December 6, the

3    Home Equity Sales Act does not apply.

4          My client signed it on — they signed on November 18th,

5    Your Honor.  But I'm just turning the tables on them.  Even if

6    they — even if what they say is true, then we're saying the Home

7    Equity Sales Act would not apply.  That's all I'm saying.  And

8    my client signed it on — or they — my client's position has

9    always been they signed on November 18th.

10         (Pause in the proceedings.)

11         MR. GILG:  Now the only — has — Your Honor, if —

12   perhaps if Mr. — if the Trustee would get the Scotts' rental

13   agreement — we don't have the rental agreement — that may shed

14   light.

15         THE COURT:  Is this in the opposition?

16         MR. GILG:  Yes, it is, Your Honor.  It's in the — in

17   the reply, reply to the Trustee's memorandum.  That's another —

18         MR. MAHER:  The document that was filed the day before

19   yesterday, which technically is really a surreply, I think.

20         MR. GILG:  Well, I apologize.  And I faxed it to Mr. —

21         THE COURT:  Well, was it in the opposition?

22         MR. GILG:  I'm not sure if it was, Your Honor.  I

23   believe it was.

24         (Pause in the proceedings.)

25         MR. GILG:  Well, he — that's on page 6.  You know, it

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124    (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 8 of 15

ER - 098

*Motion*                                                                 9

1    indicates that pursuant to the Scotts' instructions the debtor

2    gave them a $3300 cashier's check payable to their — their new

3    landlord on December 6.

4              THE COURT:  Payable to their new landlord?

5              MR. GILG:  Yes.

6              THE COURT:  Okay.  Thank you.

7              MR. GILG:  Yes.

8              THE COURT:  That doesn't prove at all that they moved

9    out before December 6.

10             MR. MAHER:  Well, no, it doesn't, Your Honor.  In

11   fact, I think their inference is that it was —

12             THE COURT:  It facilitated that.

13             MR. MAHER:  — a check — it facilitated — facilitated

14   the move-out.

15             MR. GILG:  Well, Your Honor.  Again it falls on the

16   definition of a principal place of business.  Obviously the —

17   the subject premises was not — at that point was not their

18   principal place of residence, not a business residence.  They —

19   they had contracted or —

20             THE COURT:  Okay.

21             MR. GILG:  — to move to a different — again, I guess

22   if we get the rental contract.  If we interview the landlord,

23   that would be, you know, that would —

24             THE COURT:  I think that the — my understanding of the

25   Home Equity Sales Act is it's to be liberally construed, and if

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 9 of 15

ER - 099

*Motion*                                                                     10

1    the peo- — and if the sellers are — if the contract is for the

2    sale of what, at the time, up until the sale was their principal

3    residence, the Act covers it.

4              If they are intending to move only as a process, only

5    in relationship, only after this sale is closed, then it is —

6    it's still covered by the Act.  Okay.  Thank you.

7              I'm going to approve the proposed compromise.  I want

8    to go through the *A & C Properties* factors.

9              The first factor and the most important is whether

10   this settlement is within the range of reasonableness with

11   respect to the taking account of the amount at issue and the

12   merits of the action.  And I think that there are three things

13   which make this settlement within the range of reasonableness.

14             Number one, this statute is very unforgiving.  It's a

15   very robust statue that gives the very strong power to rescind a

16   sale and to recover damages where the procedural requirements of

17   the Home Equity Sales Act are not fully complied with.

18             Number two, whether the Act is going to apply here,

19   whether there's been a violation of the Act, is going to turn

20   into a credibility contest between the applicants and the

21   debtor.

22             And the debtor's record of dealing with property and

23   inconsistent statements is like — that is a grown-up that has

24   been demonstrated in these other adversary proceedings and which

25   are likely admissible to show intent and lack of mistake are

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 10 of 15

ER - 100

*Motion*                                                    11

1   going to substantially handicap the debtor in such a credibility

2   contest.

3          The third is to go to trial would cost the estate

4   substantial attorneys' fees.  And if the estate loses they will

5   pay not only their own fees for that trial but the Scotts' fees

6   for that trial because of the fee-shifting statute.  These are

7   very, very substantial risks.

8          I agree with the Trustee that it's — from what I can

9   see of this, that the Scotts' claim is overstated in amount.  It

10  looks, however, like it — there's a substantial possibility that

11  they would prevail to some damages and that the — that there

12  would — that damages would not be insignificant, the attorneys'

13  fees would be recoverable and be significant.

14         A second *A & C* factor is the difficulty of collection.

15  I think both parties have correctly noted that that is not a

16  factor in this case and does not — not compel a settlement that

17  would otherwise not be warranted.

18         The third factor is cost and delay involved in trying

19  the claim.  I don't think delay is so much of a problem, unless

20  there was an appeal.  But the cost is for the reasons I've

21  mentioned.  It is a factual matter: it's a heavily-factual

22  matter.  There's enough at stake that the trial would require

23  considerable discovery and two or three days of trial likely.

24  And, again, there is a very distinct possibility the estate

25  would bear the cost of both sides.

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 11 of 15

ER - 101

*Motion*                                                                12

1          And last is the wishes of creditors and other

2    parties-in-interest.  Now I don't think the Trustee has

3    convinced me that the debtor, because of the fraudulent

4    conveyances, has no possible interest in the proceeds.  The

5    case, Judge Weissbrodt's decision that you decided, talks about

6    in *pari delicto*, but then also talks about *Moore versus Bay*,

7    which brings it all back into the estate.  It's very ambiguous

8    as to whether it would have the effect of that the Trustee

9    argues.

10         The one thing that is clear, however, is that the

11   creditors are — clearly have an interest in this.  And the

12   debtor may have an interest in it.  And none of the creditors

13   have objected.

14         And I think, looking at the pool of potential

15   beneficiaries realistically, the creditors are the more

16   important, and they have not objected to this.

17         So under that analysis of the *A & C Properties*, the

18   Trustee's judgment should be sustained and the settlement

19   approved.  The Trustee should be accorded authority to enter

20   into this settlement.

21         MR. MAHER:  Thank you, Your Honor.

22         There is one point I'd like to make.  And it has to do

23   with the cost of discovery, which is not too much of a factor in

24   this case, because discovery was closed.  And so I did want to

25   make —

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 12 of 15

ER - 102

*Motion*                                                                    13

1          THE COURT:  Okay.

2          MR. MAHER:  — that clarification.

3          THE COURT:  That's fine.

4          MR. MAHER:  I'll prepare an order, Your Honor.

5          Your Honor, there are two other —

6          THE COURT:  And they've claimed — I think they said

7    they've asserted they have a hundred thousand dollars in fees,

8    or thereabouts.

9          MR. MAHER:  Yes, Your Honor.

10         THE COURT:  Yes.  Which is not implausible.

11         MR. MAHER:  No, it isn't.

12         There are two other objections to claims pending by

13   the Trustee.  The debtor has piggybacked on — on both of those.

14   The debtor piggybacked on the objection to this claim, as well.

15   That's a third.

16         And I think until the Trustee resolves those claims

17   either by compromise or by trial that the debtor's objections to

18   those claims ought to be put off.  It seems unfair for the

19   creditor to have to respond to two objecting parties.

20         And I think in a Chapter 7 case it's the Trustee who

21   really objects to claims, anyway.  The debtor, if we do

22   compromise, the debtor will probably object again.  And we'll be

23   back here at a similar hearing.

24         THE COURT:  Is there any discovery being issued, or

25   anything like that?

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 13 of 15

ER - 103

*Motion*                                                                    14

1          MR. MAHER:  Not at this point.  But there is a

2   deadline of another 10 days or so for these creditors to respond

3   to the objections.  And what I may do is just file another *ex*

4   *parte* application putting those objection abeyance until the

5   Trustee's rejections — objections are resolved.

6          THE COURT:  Well, I think that that's appropriate.  I

7   mean, the Trustee is the principal party authorized to deal with

8   claims.  The role of the debtor, unless the Trustee authorizes

9   the debtor to object to a claim or until there is a proposed

10  compromise is the debtor's role is to be able to participate and

11  comment on the proposed compromise.

12         You may also have a better argument regarding the

13  *Moore v. Bay* than you made.  I don't know.  But it's just that

14  case did not resolve the question.  Okay?

15         [COUNSEL]:  Thank you, Your Honor.

16         THE COURT:  All right.  So I'll for an order from you.

17     (Proceedings were concluded at 10:09 o'clock a.m.)

18                            —o0o—

19

20

21

22

23

24

25

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 14 of 15

ER - 104

State of California                )
                                  )    SS.
County of San Joaquin             )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Northern District of California, of the

proceedings taken on the date and time previously stated in the

above matter.

        I further certify that I am not a party to nor in any

way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate No. 00124.  Palmer Reporting Services

is approved by the Administrative Office of the United States

Courts to officially prepare transcripts for the U.S. District

and Bankruptcy Courts.


                            Susan Palmer
                            Palmer Reporting Services

                            Dated April 2, 2008

PALMER REPORTING SERVICES
1948 Diamond Oak Way    Manteca California  95336-9124   (800) 665-6251
Case: 05-30047    Doc #: 415    Filed: 04/07/2008    Page 15 of 15

ER - 105

# Document No. 5

Entered on Docket
**March 05, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1  Charles P. Maher, CSBN 124748
LUCE, FORWARD, HAMILTON
2      & SCRIPPS LLP
121 Spear Street, Suite 200
3  San Francisco, California 94105
Telephone No.: 415.356.4600
4  Fax No.: 415.356.4610

5  Counsel for Andrea A. Wirum
Trustee in Bankruptcy

Signed and Filed: March 04, 2008

**THOMAS E. CARLSON**
**U.S. Bankruptcy Judge**

6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11  In re RAMIN YEGANEH,              Case No. 05-30047 TEC
                                      Chapter 7
12
                 Debtor.
13                                    Date:    February 29, 2008
                                      Time:    9:30 a.m.
14                                    Place:   235 Pine Street, 23rd Floor
                                               San Francisco
15                                    Court:   Hon. Thomas E. Carlson

16

17              **ORDER AUTHORIZING COMPROMISE**

18      On February 29, 2008, a hearing was held on the objection of Debtor Ramin Yeganeh to a

19  compromise proposed by the Trustee with Robert and Alyssa Scott.  Charles P. Maher of Luce,

20  Forward, Hamilton & Scripps, LLP, appeared on behalf of the Trustee.  William E. Gilg appeared

21  on behalf of the Debtor.

22      Based on the Trustee's notice, the documents filed in support of her compromise, and the

23  documents in opposition filed by the Debtor, and the statements on the record, and for the reasons

24  set forth by the Court on the record, it is

25      ORDERED as follows:

26      1.    The Debtor's objection is overruled.

27      2.    The Trustee is authorized to enter into the compromise with Robert and Alyssa

28  Scott described in the Trustee's January 15, 2008, notice to creditors, and read into the record on

**ER - 106**

1  the Court's January 2, 2008, calendar.

2      3.    Pursuant to the terms of the compromise as described in the Trustee's notice, the

3  claim of Robert and Alyssa Scott in the above case shall be allowed as follows:  (a) general

4  unsecured claim in the amount of $100,000 payable under 11 U.S.C. § 726(a)(2) and (b)

5  subordinated claim in the amount of $125,000 payable under 11 U.S.C. § 726(a)(4).

6      4.    The Trustee is further authorized to take those steps and execute those documents

7  she deems necessary to complete the compromise consistent with her January 15, 2008, notice to

8  creditors, and the compromise read into the record on the Court's January 2, 2008, calendar.

9

10                              *END OF ORDER*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COURT SERVICE LIST

Charles P. Maher, State Bar No. 124748
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582

United States Trustee
235 Pine Street, Suite 700
San Francisco, CA  94104

William E. Gilg, Esq.
305 San Bruno Avenue West
San Bruno, CA  94066

301032654.1

Charles P. Maher, State Bar No. 124748
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582
Telephone No.: 415.356.4600
Fax No.: 415.356.4610

Attorneys for Appellee
Andrea A. Wirum, Successor-in-Interest to
Charles E. Sims, as Chapter 7 Trustee

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re RAMIN YEGANEH,<br><br>              Debtor,<br>_____<br><br>RAMIN YEGANEH,<br><br>              Appellant,<br><br>v.<br><br>ANDREA A. WIRUM, TRUSTEE,<br><br>              Appellee. | Case No. 4:08-cv-01816 CW<br><br><br><br><br>**CERTIFICATE OF SERVICE** |

1    I, Nikki Schrager, declare as follows:

2    At the time of service, I was over 18 years of age and not a party to this

3 action.  I am employed in the County of San Francisco, State of California.  My

4 business address is Rincon Center II, 121 Spear Street, Suite 200, San Francisco,

5 California 94105-1582.

6    On July 18, 2008, I served true copies of the following document(s) described as

7        **APPELLEES' BRIEF;**

8        **APPELLEE'S EXCERPT OF RECORD**

9 on the interested parties in this action as follows:

10 ☒  **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package

11 addressed to the persons at the addresses listed in the Service List and placed the

12 envelope for collection and mailing, following our ordinary business practices.  I am

13 readily familiar with Luce, Forward, Hamilton & Scripps LLP's practice for

14 collecting and processing correspondence for mailing.  On the same day that the

15 correspondence is placed for collection and mailing, it is deposited in the ordinary

16 course of business with the United States Postal Service, in a sealed envelope with

17 postage fully prepaid.

18        William E. Gilg, Esq.
         305 San Bruno Avenue West
19        San Bruno, CA  94066

20    I declare under penalty of perjury that the foregoing is true and correct to the

21 best of my knowledge.  Executed on July 18, 2008, in San Francisco, California.

22

23

24        /s/Nikki Schrager
         Nikki Schrager

25

26

27

28