IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In Re RAMIN YEGANEH,

    Debtor.
_____

RAMIN YEGANEH,

    Appellant,

  v.

ANDREA WIRUM, Bankruptcy Trustee,

    Appellee.
_____/

No. C 08-01816 CW
Bkry No. 05-30047 TC

ORDER AFFIRMING THE ORDER OF THE BANKRUPTCY COURT

    Appellant Ramin Yeganeh appeals from the bankruptcy court's Order Authorizing Compromise (Bankruptcy Docket # 405).  Having considered all of the papers filed by the parties, the Court AFFIRMS the order of the bankruptcy court.

BACKGROUND

    The subject of this appeal is the compromise of a $500,000 proof of claim filed in Yeganeh's Chapter 7 bankruptcy case by Robert and Alyssa Scott.  The claim arose from Yeganeh's purchase of the Scotts' residence located at 1278 79th Avenue, in Oakland, California (the property).  The Scotts purchased the property in October, 2000.  In August, 2001, a notice of default was recorded against it.  In November, 2001, the Scotts filed for Chapter 13

bankruptcy protection. In their chapter 13 plan, filed on January 10, 2002, they valued the property at $180,000.

In late 2002, Yeganeh entered into an equity purchase agreement (the Agreement) with the Scotts to purchase the property for approximately $164,000. By grant deed executed on December 6, 2002, the Scotts conveyed title to the property to Yeganeh using the name "R. Rad, a single man." After receiving title, Yeganeh conveyed the property to an entity called Allied Management Trust.

On August 19, 2003, the Scotts, through counsel, sent Yeganeh a notice of cancellation in which they demanded return of the property. In December, 2003, the Scotts filed a complaint in state court in which they sought rescission and cancellation of the Agreement. That case is still pending in state court.

On January 7, 2005, Yeganeh filed a Chapter 13 bankruptcy petition which was converted into a Chapter 7 case on January 21, 2005. On April 28, 2005, the Scotts filed their general unsecured claim in the amount of $500,000 based on Yeganeh's alleged violation of California's Home Equity Sales Act (HESA) and other California laws when he purchased the property at the time it was under threat of foreclosure. The Scotts claimed the value of the property at the time of the sale was $240,000. Appellee, the Chapter 7 trustee, valued the property at $190,000.

In January, 2007, the trustee filed an objection to the Scotts' claim. The Scotts filed an opposition disputing many of the facts in the objection. A trial was scheduled to begin on January 2, 2008. The trustee estimated that a trial would take three to four days and cost the estate a considerable sum in damages and attorneys' fees.

2

Shortly before the trial date, settlement discussions took place between the trustee and the Scotts. An agreement was reached and counsel for the trustee and for the Scotts appeared in bankruptcy court on the trial date and read the settlement terms into the record. The settlement provided that the Scotts' claim was reduced to $225,000 and was divided into two components: (1) a $100,000 unsecured claim entitled to pro rata payment with other unsecured creditors, and (2) a lower priority $125,000 claim that would be paid only after all general unsecured claims were paid in full. Yeganeh objected to the settlement. No creditor objected. On February 29, 2008, a hearing was held on Yeganeh's objection. The bankruptcy court provided the following reasons on the record for approving the compromise.

> I'm going to approve the proposed compromise. I want to go through the A & C Properties factors.
>
> The first factor and the most important is whether this settlement is within the range of reasonableness with respect to the taking account of the amount at issue and the merits of the action. And I think that there are three things which make this settlement within the range of reasonableness.
>
> Number one, this statute is very unforgiving. It's a very robust statute that gives the very strong power to rescind a sale and to recover damages where the procedural requirements of the Home Equity Sales Act are not fully complied with.
>
> Number two, whether the Act is going to apply here, whether there's been a violation of the Act, is going to turn into a credibility contest between the applicants and the debtor.
>
> And the debtor's record of dealing with property and inconsistent statements is like--that is a grown-up that has been demonstrated in these other adversary proceedings and which are likely admissible to show intent and lack of mistake are going to substantially handicap the debtor in such a credibility contest.
>
> The third is to go to trial would cost the estate

3

> substantial attorneys' fees. And if the estate loses they will pay not only their own fees for that trial but the Scotts' fees for that trial because of the fee-shifting statute. These are very, very substantial risks.
>
> I agree with the Trustee that it's--from what I can see of this, that the Scotts' claim is overstated in amount. It looks, however, like it--there's a substantial possibility that they would prevail to some damages and that the--that there would--that damages would not be insignificant, the attorneys' fees would be recoverable and be significant.
>
> A second <u>A & C</u> factor is the difficulty of collection. I think both parties have correctly noted that that is not a factor in this case and does not--not compel a settlement that would otherwise not be warranted.
>
> The third factor is cost and delay involved in trying the claim. I don't think delay is so much of a problem, unless there was an appeal. But the cost is for the reasons I've mentioned. It is a factual matter . . . There's enough at stake that the trial would require considerable discovery and two or three days of trial likely. And, again, there is a very distinct possibility the estate would bear the cost of both sides.
>
> And last is the wishes of creditors and other parties-in-interest. Now I don't think the Trustee has convinced me that the debtor, because of the fraudulent conveyances, has no possible interest in the proceeds. . . .
>
> The one thing that is clear, however, is that the creditors are--clearly have an interest in this. And the debtor may have an interest in it. And none of the creditors have objected.
>
> And I think, looking at the pool of potential beneficiaries realistically, the creditors are the more important, and they have not objected to this.
>
> So under that analysis of the <u>A & C Properties</u>, the Trustee's judgment should be sustained and the settlement approved.

Excerpt of Record (ER) 100-02.

### STANDARD OF REVIEW

A district court has jurisdiction to hear appeals from a bankruptcy court pursuant to 28 U.S.C. § 158(a). An order authorizing a compromise in a bankruptcy case is reviewed for an

4

abuse of discretion.  In re A & C Properties, 784 F.2d 1377, 1380 (9th Cir. 1986).  The district court reviews the bankruptcy court's embedded findings of fact for clear error and reviews findings of law de novo.  Fed. R. Bankr. P. 8013; In re Lockard, 884 F.2d 1171, 1174 (9th Cir. 1989).

In order to determine the "fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

In re A & C Properties, 784 F.2d at 1381.

The Bankruptcy Code authorizes a trustee to compromise any controversy arising in the administration of the estate "upon such terms as he may deem for the best interest of the estate," and with the approval of the bankruptcy court.  Id. at 1380.  The purpose of a compromise is to allow the trustee and the creditors to avoid the expense and burdens of litigating sharply contested and dubious claims.  Id. at 1380-81.  "The law favors compromise and not litigation for its own sake, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed."  Id. at 1381.

## DISCUSSION

Yeganeh argues that the bankruptcy court abused its discretion in applying the A & C Properties factors to the compromise reached between the trustee and the Scotts and in approving the compromise.

5

I.  First A & C Factor: Probability of Success in the Litigation

Yeganeh submits several grounds for his theory that the Scotts would probably lose at trial.

A. Prima Facie Validity of the Scotts' Claim

Yeganeh argues that the Scotts' claim is prima facie invalid because they failed to attach to the claim the Equity Purchase Agreement upon which the claim was based.  The trustee points out that she first objected to the Scotts' claim on this basis, but the Scotts rectified this by presenting documentary evidence in support of their claim.  Because the record includes the Equity Purchase Agreement, see ER 50-51, this argument fails.

B. Merit of the Scotts' Claim

Yeganeh argues that the Scotts' claim is meritless because (1) he fully complied with HESA, and (2) even if HESA was violated, the Scotts suffered no damages.

1. HESA Violation

California's Home Equity Sales Act (HESA), Cal. Civ. Code §§ 1695 et seq., provides protections to a homeowner when a residence in foreclosure is sold to an equity purchaser.  HESA requires that the sales agreement be in writing and that it contain specific terms aimed at protecting the homeowner. Boquilon v. Beckwith, 49 Cal. App. 4th 1697, 1709 (1996).  Depending on the nature of the violation, the seller may be entitled to rescission of the contract or other equitable relief or damages, including exemplary damages "in an amount not less than three times the equity seller's actual damages."  Id. at 1710; Cal. Civ. Code § 1695.7.  HESA shall be liberally construed to effectuate its

6

purposes. Cal. Civ. Code § 1695(d)(2).

Yeganeh argues that the Agreement "fully complied with HESA and clearly spelled out the terms and conditions of the sale." Yeganeh acknowledges that the Scotts maintain, <u>inter alia</u>, that they were not given a right of cancellation and that they were not aware of the sales price or the amount of consideration. Nevertheless, he concludes that, because the Scotts' evidence is contradicted by his evidence, there is no dispute of fact and the Scotts would have lost at trial. However, a dispute of fact does not disappear because one side thinks his version of the facts is more correct than that of the opposing party.

The trustee believed there was a reasonable likelihood that the Scotts would prevail on at least some of their eight HESA claims and that "there is no question that the evidence of the events leading up to the agreement would be disputed, and the key facts about when meetings took place, what the Debtor said in those meetings, and when documents were actually signed would be disputed." ER at 86. For instance, the Scotts had evidence that the Agreement was actually executed on December 6, 2002, but that Yeganeh had backdated it to November 18, 2002. ER at 88. If this were found to be true by the trier of fact, it would support a number of the Scotts' HESA claims. Other factual disputes were (1) whether Yeganeh provided the Scotts with written notice of their right to refrain from signing any instruments of conveyance until the cancellation period had lapsed, as required by California Civil Code § 1695.3(h); (2) whether Yeganeh provided the Scotts with the name, business address, and telephone number of the purchaser as required by California Civil Code § 1695(a); whether

7

Yeganeh used an alias of R. Rad instead of providing the Scotts with his true name. ER at 88. Furthermore, as noted by the bankruptcy court, HESA is a "robust statute that gives the very strong power to rescind a sale and to recover damages where the procedural requirements of the Home Equity Sales Act are not fully complied with." ER at 100.

Moreover, as noted by the trustee, Yeganeh had a record before the court of making inconsistent statements and his lack of credibility would be a strong factor in favor of the Scotts were a trial to take place. Yeganeh argues that the trustee has no justification for questioning his credibility. However, the bankruptcy judge also concluded that Yeganeh's inconsistent statements in other adversary proceedings in his bankruptcy case would likely be admissible "to show intent and lack of mistake" at a trial on the Scotts' claims and would handicap the trustee in a credibility contest. ER at 100-01. Because the bankruptcy court had the opportunity to witness Yeganeh's demeanor and testimony in other proceedings before it, its finding regarding Yeganeh's credibility merits great weight.

Yeganeh points out that the trustee's original position was that the Scotts' claim was frivolous and should be disallowed. The trustee agrees that at first she believed that the Scotts could not prove the validity of their claim, but explains that her analysis was based on information provided primarily by Yeganeh and a belief in his credibility. Since that time, the trustee became aware of the discrepancies in the evidence. The fact that the trustee's position evolved over time is not relevant to a review of the bankruptcy court's decision.

8

Therefore, the bankruptcy court did not abuse its discretion in finding that there was a good likelihood that the Scotts would prevail at trial on the issue of liability under HESA.

B. Damages

Yeganeh argues that there is no monetary value to the Scotts' HESA claims. He argues that the Scotts' contention that the property was worth $240,000 at the time of the sale is contradicted by the fact that, at that time, the house was in foreclosure proceedings and if the Scotts had not sold the property to him, they would likely have lost it for the value of the mortgage. He also points to the Scotts' January, 2002 Chapter 13 bankruptcy filings in which they valued the property at $180,000.

Both the trustee and the bankruptcy court acknowledged that the Scotts' $500,000 claim was overstated. However, unlike Yeganeh's, their analyses focused on the amount of damages obtainable under HESA. For an objective opinion, the trustee employed her own appraiser who valued the property at the time of purchase at $190,000. This value was $26,000 higher than Yeganeh paid for the property. Therefore, had the Scotts prevailed on any of their HESA claims, they could have been awarded $26,000 in compensatory damages. However, the trustee considered, as did the bankruptcy court, that under HESA, Cal. Civ. Code § 1695.7, the court may award exemplary damages in an amount not less than three times the equity seller's actual damages. Thus, the award could have been $78,000 or more. In addition to this, if they prevailed, the Scotts would be awarded their attorneys' fees.

Taking into consideration the array of damages allowable under HESA, the bankruptcy court did not abuse its discretion in finding

9

that damages under HESA would be significant.

## II. Third A & C Factor: Cost and Delay[1]

Yeganeh argues that the bankruptcy court's finding in the trustee's favor on the cost factor was an abuse of discretion.

The bankruptcy court noted that, if the Scotts' claim went to trial, attorneys' fees would be significant because considerable discovery would be required, heavily factual matters would be litigated, and the trial would last at least two or three days. Furthermore, the court noted that, under HESA, the estate could be liable for the attorneys' fees incurred by the Scotts as well as the estate. ER at 101. Valid reasons support the bankruptcy court's conclusion that there was a good likelihood that the estate would incur significant costs if the claim were litigated.

Yeganeh also argues that the costs are not relevant because he would litigate this claim at his own expense, at no cost to the bankruptcy estate. However, Yeganeh, who is a debtor in a Chapter 7 bankruptcy case, does not explain how he could pay for his own attorneys' fees, let alone the Scotts' attorneys' fees plus actual and exemplary damages. Therefore, this argument is unpersuasive.

## III. Fourth A & C Factor: Interest of the Creditors

Yeganeh argues that, because the claims of the Scotts and two other individuals who were involved in the sale of the property should be disallowed, they are not creditors of the estate and, thus, the interest-of-the-creditors factor is not relevant. However, Yeganeh fails to disclose how many creditors there are in

---

[1] All parties, and the bankruptcy court, agreed that the second A & C factor was not at issue in this case. They also agreed that delay was not an issue.

his bankruptcy case. The fact that no other creditors objected to the settlement of the Scotts' claim is relevant and significant.

As indicated by the trustee, once she recognized the risk of liability, she had to calculate the estate's exposure to damages. For the reasons discussed above, the trustee concluded, as did the bankruptcy court, that the Scotts would be entitled to a claim in some amount, a large part of which would be a general unsecured claim in the bankruptcy case, to the detriment of the creditors.

The settlement negotiated by the trustee provided that $125,000 of the claim would be subordinated to the general unsecured creditors and only $100,000 would be a general unsecured claim. Thus, the trustee mitigated the creditors' exposure by avoiding a potentially much larger general unsecured claim against the estate.

The bankruptcy court properly considered the fact that none of the creditors had objected to the settlement and concluded that the creditors felt their position was better with the settlement than without it. Accordingly, the bankruptcy court did not abuse its discretion in resolving this factor in favor of the settlement.

## CONCLUSION

For the foregoing reasons, the order of the bankruptcy court is AFFIRMED. The trustee shall recover her costs from Yeganeh.

IT IS SO ORDERED.

Dated: 10/14/08

CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

YEGANEH et al,

        Plaintiff,

  v.

 et al,

        Defendant.

Case Number: CV08-01816 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 14, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

USBC Manager-San Francisco
United States Bankruptcy Court
235 Pine Street
P.O. Box 7341
San Francisco,  CA 94120-7341

Thomas E. Carlson
US Bankruptcy Court - San Francisco
235 Pine Street
PO Box 7341
San Francisco,  CA 94120

Dated: October 14, 2008

        Richard W. Wieking, Clerk
        By: Sheilah Cahill, Deputy Clerk

12